**RUTGERS, The State University of New Jersey, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 96–399C.**

United States Court of Federal Claims.

Sept. 16, 1998.

Thomas L. McGovern III, Washington, D.C., for plaintiff. Robert J. Kenney, Jr., Joy E. Sturm, Washington, D.C., of counsel.

William C. Bergmann, Washington, D.C., with whom were Assistant Attorney General Frank W. Hunger, Director Vito J. DiPietro, for defendant. Thomas J. Byrnes, Department of Justice, of counsel.

## ORDER

MOODY R. TIDWELL, III, Senior Judge.

On July 3, 1996, Rutgers, The State University of New Jersey (plaintiff or Rutgers) filed a Complaint against defendant, the United States of America (United States or government), praying for a declaration that defendant had no contractual rights in the invention of an electrostrictive driving device and process for sonic wave projection (invention '979 [1]) governed by United States Patent No. 5,229,979 (patent '979). On January 23, 1998, the United States of America filed Defendant's Motion for Summary Judgment or in the Alternative Partial Summary Judgment (motion for summary judgment or Mot. for Summ. J.). For the reasons which follow, the court denies the government's motion.

## BACKGROUND

Dr. Jerry I. Scheinbeim has been a faculty member at Rutgers since 1977. App. to Def.'s Mot. for Summ. J. or in the Alterna-

---

1. Patent number 5,229,979 actually comprises 30 individual claims, each of which is a separate invention. *See Gould v. United States*, 217 Ct.Cl. 167, 579 F.2d 571, 576 (1978) ("important to keep in mind that each claim of a patent is a separate and distinct invention"). However, for convenience, the court will refer to all of the patented claims collectively as "invention '979" unless otherwise identified by individual claim number.

tive Partial Summ. J. (Def.'s App.) at 107. Dr. Brian A. Newman has been a member of Rutgers' faculty since 1974. *Id.* at 128. Between 1979 and 1990, Drs. Scheinbeim and Newman had submitted at least fourteen research proposals which were funded by the Office of Naval Research (ONR) or the Defense Advanced Research Projects Agency (DARPA). Defendant's Proposed Findings of Uncontroverted Fact (Def.'s Proposed Findings) at ¶ 16 (January 23, 1998) (uncontested by Pl.'s Statement of Genuine Issues (April 1, 1998)). In 1980, Rutgers and the government entered into contract N00014–80–C–0795 (contract '795) with ONR. Def.'s App. at 166. Contract '795 was entitled "Piezoelectricity, Pyroelectricity and Related Electrical Properties in Polyamide and Other Electret Films." *Id.* The government has asserted that contract '795 involved "the general technological area [of] 'piezoelectricity [2] and related properties such as pyroelectricity, electrostriction [3] and ferroelectricity....' " *Id.* Plaintiff denied the government's characterization of the work performed. *Id.*

In August 1987, Drs. Scheinbeim and Newman submitted to ONR a proposal to extend contract '795 (August 1987 proposal). *Id.* at 200. The proposal described newly developed processes for making polarized polymer films using "a radically different electro-pro-cessing approach: the solidification of polar polymers from solution in the presence of a high electric field" which made the films more stable and made it conceivable that "greatly increased bulk polarization exists" which could affect piezoelectric and pyroelectric responses. *Id.* at 202–11. Rutgers revised the proposal's budget in December 1987. *Id.* at 234–37.

In February 1988, ONR agreed to the terms of the August 1987 proposal, as modified in December 1987 and January 1988, and incorporated by reference the terms of those proposals into short form contract N00014–88–K–0122 (contract 122). *Id.* at 238–39. Also in February 1988, Drs. Scheinbeim and Newman presented another proposal to ONR and DARPA, requesting a grant to fund further study of crystallization and vitrification of piezoelectric materials from solution in the presence of high electric fields. *Id.* at 242–54. No mention of electrostriction or "apparent piezoelectricity" appears in either the August 1987, December 1987, or February 1988 proposals.

On May 16, 1989, Rutgers was awarded United States Patent No. 4,830,795 (patent '795) for an invention designed by Drs. Scheinbeim and Newman to make polarized polymer material substantially free of mechanically induced orientation. *Id.* at 168.

---

**2.** For purposes of the motion for summary judgment, the government agreed to use plaintiff's definition of piezoelectricity found in the Complaint. Mot. for Summ. J. at 3.

27. A material is said to be "piezoelectric" ("piezo-" deriving from the Greek word "piezin", meaning "pressure") if application of mechanical stress or strain (*i.e.*, pressure) on the material causes the "dipoles" in the material (for polymers, molecules with separated electrical charges) to change their state of electric polarization and produce an electric field on the surface of the material. This reaction is [sic] to mechanical stress or strain is called a "piezoelectric response".

28. A material is "polarized" if the dipoles of the material are aligned so that all of their positive electric poles point in the same general direction and all of their negative poles point in the opposite general direction. The process of causing such alignment of dipoles by a strong electric field is referred to as "polarization" or "poling".

29. The inverse of the piezoelectric response is demonstrated when the application of an external electrical field to a piezoelectric material changes the state of polarization of the electrical dipoles in the material and, thereby, produces mechanical stress or strain (*i.e.*, a change in shape).
Complaint at ¶¶ 27–29.

**3.** For purposes of the motion for summary judgment, the government also agreed to use the Complaint's definition of electrostriction. Mot. for Summ. J. at 3.

33. Electrostriction involves the rearrangement or "repacking" of molecules of a material, often into a tighter, more constricted structure, when the material is subjected to an electric field. A sample of material, therefore, may become measurably thinner and thinner (within limits) when subjected to a stronger and stronger electric field.

34. The mechanical strain induced by electrostriction is analogous to, but distinct from, strain induced by a piezoelectric response. Electrostrictive strain is proportional to the square of the electric field ($E^2$). The piezoelectric strain is proportional to the electric field (E).
Complaint at ¶¶ 33–34.

Patent '795 documents acknowledge that the "invention was made with government support under the Office of Naval Research" and that "the Government has certain rights in the invention" under contract '795. *Id.* at 173. On September 5, 1989, Patent No. 4,863,648 (patent '648) was awarded to Rutgers for a process related to patent '795 for poling piezoelectric materials molded into desired shapes (invention '648). *Id.* at 168, 182 (application for patent '648 a continuation-in-part of application for patent '795). Patent '648 also noted that invention '648 was made with ONR support and that the government had certain rights in the patented technology. *Id.* at 182.

In October 1989, Mr. Alan Ellinthorpe (Ellinthorpe), from DARPA, approached Dr. Scheinbeim seeking a pliable material with enhanced piezoelectric properties, such as a softened form of polyvinylidene fluoride (PVFD or PVF$_2$), capable of driving a sonic transducer. *Id.* at 100; App. Pl.'s Opp'n to Def.'s Mot. for Summ. J. or in the Alternative Partial Summ. J. (Pl.'s App.) at Tab 9; *see also* Def.'s Proposed Findings at ¶ 36. In response to Ellinthorpe's inquiry, in October 1989 Dr. Scheinbeim "determined that no existing piezoelectric polymer could exhibit this set of properties," Def's.App. at 265, but "conceived of the idea to apply a large DC [direct current] electrical bias field to the PVFD while at the same time pulsing it with an AC [alternating current] electrical field" to exploit PVFD's electrostrictive properties. *Id.* at 100 (Pl.'s Resps. to Def.'s First Set of Interrogs.); *see also* Def.'s Proposed Findings at ¶ 36 ("In October of 1989, in response to an inquiry from a DARPA employee, Professors Scheinbeim and Newman conceived the invention which eventually resulted in the independent claims[4] of the '979 patent.") (uncontested by Pl.'s Statement of Genuine Issues). Actual reduction to practice of the independent claims occurred during a series of tests conducted at BBN Laboratories in Cambridge, Massachusetts, from February to April 1990. Def.'s App. at 103; *see also* Pl.'s Statement of Genuine Issues (incorporating Pl.'s Opp'n to Mot. for Summ. J. at

34–35 agreeing with Def.'s Proposed Findings at ¶ 38 to extent that independent claims were reduced to practice during BBN tests). In April 1990, Drs. Scheinbeim and Newman submitted an invention disclosure report to Rutgers stating that they had invented a "[p]rocess to produce materials and impart to them high electrostrictive or apparent piezoelectric response." Def.'s App. at 261. The disclosure report states that the invention was "funded by DARPA/ONR." *Id.* at 262.

In August 1990, Drs. Scheinbeim and Newman submitted a proposal to modify contract '122. *Id.* at 264. It stated that in response to Ellinthorpe's request, Drs. Scheinbeim and Newman proposed to research the "radically new approach" of applying a high DC bias field to electrostrictive materials such as PVFD which had been heavily plasticized by solvents such as tricresylphosphate (TCP), then superimposing an alternating current on the bias field to create an "apparent" piezoelectric response. *Id.* at 265. In September 1990, Drs. Scheinbeim and Newman submitted to ONR an end-of-the-year report which mentioned that a patent was pending for the "Process to Produce Materials and Impart to them High Electrostrictive or Apparent Piezoelectric Response." *Id.* at 290.

On December 14, 1990, Drs. Scheinbeim and Newman filed a patent application for a "Novel Electrostrictive Driving Device, Process for Sonic Wave Projection and Polymer Materials for Use Therein" as a continuation-in-part of several earlier applications. *Id.* at 29. Five days later, on December 19, 1990, ONR accepted the August 1990 proposal as a modification of contract '122 (modification P00005), retroactively effective November 15, 1990, and agreed to provide an additional $95,000 in funding. *Id.* at 271. Plaintiff admits that the $95,000 was used to purchase testing equipment under contract '122. *Id.* at 106; Pl.'s Statement of Genuine Issues at ¶ 54 ("Rutgers did use the $95,000 in funding provided under modification P00005 to pur-

4. Of the 30 claims in patent '979, claims 1, 10, and 18 are independent. Each of the 27 dependent claims incorporates one of the independent

claims by reference and modifies it in one or more aspects. Def.'s App. at 23–24.

chase components for building test equipment ultimately used to test polyurethane").

In June 1991, Rutgers' Office of Corporate Liaison and Technology Transfer sent ONR a copy of the patent application with a letter declaring Rutgers' intent to comply with the invention disclosure requirements of ONR contracts. Def.'s App. at 322. After abandoning the December 14, 1990 patent application, Drs. Scheinbeim and Newman filed a second patent application on December 13, 1991, for the electrostrictive driving device. Id. at 18.

On April 20, 1993, Rutgers was awarded Patent No. 5,204,013 (patent '013), which was a continuation-in-part of patents '648 and '795. Id. at 192. Patent '013 described a process invented by Drs. Scheinbeim and Newman for making polarized materials from various polymers, copolymers, soluble ceramic materials, and combinations thereof (invention '013). Id. at 196. Patent '013 also acknowledged that the government had rights in invention '013. Id. at 192.

On July 20, 1993, Rutgers was awarded patent '979 for the invention at issue in this case (invention '979). Id. at 18. Invention '979 was described as an electrostrictive driving device, a process for sonic wave projection, and polymer materials used in the device and the process. The electrostrictive driving device has a sonic wave projector made from alternating layers of plasticized polymer films (such as a PVFD/TCP blend) and electrodes. Id. at 18–23. The electrodes are attached to a DC bias supply which provides a high, constant voltage. See id. An AC signal is superimposed on the DC voltage to create fluctuations in the voltage applied to the electrostrictive polymer. See id. Because the electrostrictive polymer contracts and expands according to the voltage applied, the AC signal causes the polymer to generate sonic waves. See id.

Patent '979 describes 30 claims, including three independent claims: Claim 1 describes an electrostrictive driving device, claim 10 describes a sonic wave projection element, and claim 18 describes a process for sonic wave projection. Id. at 23–24. Each of the 27 dependent claims incorporates one independent claim by reference and modifies it in one or more ways, such as substituting a different polymer/plasticizer blend for the PVFD TCP solution, specifying different polymer film thicknesses and sensitivities, or specifying a range of DC bias voltage. See id. Claim 5 incorporates claim 1 and describes an electrostrictive driving device using polyurethane as the electrostrictive polymeric material. Id. at 23. Claim 23 incorporates claim 18 by reference and describes a process for sonic wave projection using polyurethane as the electrostrictive polymeric material. Id. at 24.

On August 12, 1993, an ONR contracting officer issued a final decision finding that the government was entitled to a nonexclusive, nontransferable, irrevocable, paid-up license in the '979 invention. Pl.'s App. at Tab 19, p. 6. Plaintiff filed suit in this court in July 1996.

## DISCUSSION

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See RCFC 56(c); Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it might significantly affect the outcome of the suit under the governing law. See Anderson, 477 U.S. at 248, 106 S.Ct. 2505. In deciding a motion for summary judgment, the role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249, 106 S.Ct. 2505.

Generally, the party moving for summary judgment bears the initial burden of demonstrating the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of supporting evidence, then the burden shifts to the nonmoving party to show that a genuine factual dispute exists. See id.; Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1563 (Fed.Cir.1987) (quoting Celotex, 477 U.S. at 325, 106 S.Ct. 2548). However, when a defendant raises an affirmative defense as

the grounds for summary judgment, the defendant bears the burdens of showing (1) that all of the elements of its affirmative defense are substantiated by evidence, *see Gregory Lumber Co. v. United States*, 11 Cl.Ct. 489, 499 (1986), *aff'd*, 831 F.2d 305, 1987 WL 38585 (Fed.Cir.1987), *and cert. denied*, 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 982 (1988); and (2) that no issue of material fact exists as to any of those elements. *See* RCFC 56(c). These burdens may not be discharged by cryptic, conclusory, or generalized responses. *See Willetts v. Ford Motor Co.*, 583 F.2d 852, 856 (6th Cir. 1978).

The court must resolve any doubts over factual issues in favor of the party opposing summary judgment. *See Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985). The non-movant is also entitled to the benefit of all presumptions and inferences. *See H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

In this case the government moves for summary judgment arguing that contract '122 grants it a license to use patent '979 technology. License to use patented technology is an affirmative defense which imposes the burden of proving the existence of a license on the defendant. *See Technical Development Corp. v. United States*, 220 Ct. Cl. 128, 597 F.2d 733, 746 (1979) ("defendant bears the burden of proof on the license defense"). The question of whether the government has a license is resolved by determining whether invention '979 was either conceived or first reduced to practice in performance of an existing government contract. *See id.*

"It is well settled that the interpretation of a contract is a question of law." *Ceccanti, Inc. v. United States*, 6 Cl.Ct. 526, 528 (1984); *see also Hughes Communications Galaxy, Inc. v. United States*, 998 F.2d 953, 957 (Fed.Cir.1993); *Omni Corp. v. United States*, 41 Fed.Cl. 585, (1998). Because questions of contract interpretation are issues of law, they may generally be decided on summary judgment. *See Omni*, 41 Fed.Cl. at 595. However, under some circumstances, contract inter-

pretation may be inextricably intertwined with underlying questions of material fact, *see Conoco Inc. v. United States*, 35 Fed. Cl. 309, 321 (1996), and "[t]o the extent that the contract terms are ambiguous, requiring weighing of external evidence, the matter is not amenable to summary resolution." *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed.Cir.1988).

Similarly, "[w]here ... no underlying fact issue must be resolved, claim interpretation is a question of law." *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1579 (Fed.Cir.1989). "[A] mere dispute over the meaning of a term does not itself create an issue of fact. This is true even where the meaning cannot be determined without resort to ... extrinsic evidence[,] provided ... that there is no genuine underlying issue of material fact." *Id.* at 1579. Pertinent, probative evidence may create a genuine conflict, but "without such evidentiary conflict, claim interpretation may be resolved as an issue of law by the court on summary judgment taking into account the specification, prosecution history or other evidence." *Id.* at 1579–80.

■ Whether the government has a license in patent '979 depends upon the terms of contract '122. Plaintiff and defendant do not dispute that contract '122 incorporated the April 1984 version of the Federal Acquisition Regulations' Patent Rights Clause (patent rights clause), *see* Complaint at ¶¶ 11–13; Answer at ¶¶ 11–13, which states that "[w]ith respect to any subject invention in which the Contractor retains title, the Federal Government shall have a nonexclusive, nontransferable, irrevocable, paid-up license to practice or have practiced for or on behalf of the United States the subject invention throughout the world." 48 C.F.R. § 52.227–11(b) (1987). A "subject invention" is defined by the patent rights clause as "any invention of the Contractor conceived or first actually reduced to practice in the performance of work under this contract." 48 C.F.R. § 52.227–11(a). Thus, if undisputed facts demonstrate that invention '979 was either conceived or first reduced to practice in the performance of contract '122, then the government is entitled to a license. *See Technical Development Corp.*, 597 F.2d at

735, at 746–47, 749–50 (government entitled to license after showing by preponderating evidence that patented inventions were conceived or first reduced to practice during performance of government contracts). If the government has a license to use invention '979, the court must grant summary judgment. *See Kersavage v. United States,* 36 Fed. Cl. 441 at 448, 453–54 (1996) (government entitled to summary judgment after showing patented invention was first reduced to practice under contract).

The phrase "in the performance of" has long been construed liberally by the courts. In *Mine Safety Appliances Co. v. United States,* 176 Ct.Cl. 777, 364 F.2d 385 (1966), the Court of Claims quoted the following with approval:

> Inventions made under a Government contract are the product of expenditures from the public treasury in the course of a governmental function; the public, having in a sense ordered and paid for the invention through its representatives, should not again be taxed for its use, nor excluded from its use nor permitted to use it upon restrictive conditions advantageous to no one but the patent owner.

*Id.* at 392 (quoting Investigation of Government Patent Practices and Policies, Report and Recommendations of the Attorney General to the President, Vol. I, pp. 88–89 (1947)). The court expounded upon that language, stating:

> Under such a liberal construction ... [t]he Government has the right to use, royalty-free, those inventions which have a "close and umbilical relationship" to the work and research funded by the United States and were crystallized during performance of the federal contract. If the invention is so tied to the work to be done under the contract as to contribute significantly to the results anticipated by that agreement, the Government is entitled to a license.

*Technical Development Corp.,* 597 F.2d at 745–46 (citations omitted).

In this case, the government's motion for summary judgment must be granted only if undisputed facts show that (1) invention '979 fell within the scope of contract '122, and (2) invention '979 was conceived or first reduced to practice during the effective period of contract '122.

## I. Scope of Contract '122

Contract '122 is a short form contract comprised of the two-page contract form, a two-page continuation sheet appended to the form, the general regulatory provisions incorporated by reference, and the August 1987 proposal incorporated by reference. *See* Def.'s App. at 238–39. The scope of the research to be performed under the contract is defined by the August 1987 proposal. As part of the contract, the meaning of the proposal's terms is a question of law which may be decided on summary judgment. *See Ceccanti,* 6 Cl.Ct. at 528; *Omni,* 41 Fed.Cl. at 595.

The introduction to the proposal stated:

The object of the proposed research is to:

> (a) study the effect of high electric fields on the crystallization and solidification of $PVF_2$, odd nylons and other polar polymers from solution and to determine the electroprocessing conditions which give polymer electret films the highest bulk polarization, combined with thermal stability.

> (b) to study the relation between plasticizer, plasticizer content, crystal structure and morphology, and dipole orientation on electret properties.

> (c) to investigate the effect of rapid solidification on crystallization and morphology of several odd nylons including Nylon 11, 7, 5 and 3 and to determine the piezoelectric and pyroelectric response of these films following poling and possibly other processing steps. If successful, these processes will be extended to continue a similar investigation for $PVF_2$.

Def.'s App. at 202–03. The "Proposed Research" section used a somewhat different organization to describe the research:

> *Part I*—To study the crystallization of $PVF_2$ from solution in the presence of high electric poling fields, and to study the relationship between polng [sic] conditions and the resulting crystal structure, morphology, solvent retention and the piezoelectric,

pyroelectric, dielectric and mechanical properties of the films produced.

*Part II*—To study the relationship between plasticizer, plasticizer content, crystal structure, morphology, and dipole orientation on electret properties.

*Part III*—... [T]o explore the option of extending the quenching rate over that possible using conventional thermal quenches by using the pressure-quenching technique, to see what limitations on maximum piezoelectric and pyroelectric response exist.

Def.'s App. at 207–10.

The court finds that the research proposed, accepted, and incorporated by reference into contract '122 focused on the development of processing techniques designed to make plasticized polymer films with greater polarization and increased stability which might enhance their piezoelectric response. No part of contract '122 mentions electrostriction. Furthermore, according to plaintiff's definitions of electrostriction and piezoelectricity which the court is using for the purpose of deciding the motion for summary judgment, *see* Mot. for Summ. J. at 3, the court finds as a matter of law that there is insufficient connection between the two phenomena to bring the electrostrictive driving device described by patent '979 within the scope of original contract '122.[5] *See Johnston*, 885 F.2d at 1579–80 (patent claim interpretation is issue of law).

However, the inquiry into the scope of contract '122 does not end there. Modification P00005 incorporated into contract '122 the terms of Rutgers' August 1990 proposal. That significantly expanded the scope of the research and, consequently, the breadth of the patent rights clause. When Rutgers signed modification P00005, it agreed to "furnish and deliver all items or perform all services set forth in the proposal identified in block 19" of the short form. Def.'s App. at 271–72. Block 19 states:

19. BASIS FOR AWARD OR MODIFICATION *(X and complete as applicable)*

 a. PROPOSAL INCORPORATED BY REFERENCE

 (1) DATE (YYMMDD) **August 1990**

 (2) TITLE

X **High d33 "Apparent" Piezoelectric Polymers**

 ...

 c. OTHER *(specify)*

**The purpose of this modification is to expand the research effort under**

X **Contract Number N00014–88–K–0122. Accordingly, there are hereby provided a revision in the description of work; an increase in the total estimated cost, and an extension in the period of performance of subject contract.**

Def.'s App. at 272 (italics in original, bold indicates text typed onto otherwise printed form). Therefore, the August 1990 research proposal became part of contract '122 and redefined its scope.

The expanded scope of the contract was significant. Modification P00005 stated in its introductory abstract:

In response to a request from Dr. Alan Ellinthorpe of DARPA for a new type of piezoelectric material ... [w]e proposed a radically new approach: the use of heavily plasticized, low crystallinity polymeric material (a [PVFD–TCP] blend) to be driven under a high electric "bias" field in order to take advantage of the electrostrictive behavior of these materials and the fact that the electrostrictive response is proportional to the square of the applied electric field.

*Id.* at 265. "Two tracks should be followed" to develop "these newly discovered 'soggy' piezoelectric materials requiring high D.C. bias," said the modification. *Id.* at 266. First, efforts would be made to "determine the major mechanisms responsible for the

---

**5.** The court assumes, for purposes of the reasoning developed here, that the terms of the contract are unambiguous. If, on the other hand, the court were to find that external evidence showed that the contract was ambiguous, then there would be a question of contract interpretation inextricably intertwined with underlying issues of material fact. That would require the court to weigh external evidence, the matter would not be amenable to summary resolution, and the government's motion would have to be denied. *See Beta Systems*, 838 F.2d at 1183.

large 'apparent' $d_{33}$ coefficient" using PVFD plasticized with TCP, butyl phthalate, and other phosphate and pthalate blends. *Id.* at 266. Once the mechanisms were identified, research would be extended beyond PVFD to include phosphazenes, and siloxanes. *Id.* Depending upon whether crystallinity was found to be important, either semicrystalline (such as, but not limited to, polyvinyl chloride (PVC)) or plasticized polymers (including, PVC, polyacrylonitrile, and vinylidene cyanide-vinyl acetate) would be investigated. *Id.* at 266–67.

A liberal reading of these contractual terms shows that patent '979 falls within the scope of contract '122. The patent's introductory sections describe invention '979 in the same terms used to describe the proposed research in the modified contract:

> This invention relates to an electrostrictive driving device utilizing an element comprising a film layer or layers of a polymeric material. The film of the element in operation has a high bias voltage to which is applied an alternating voltage whereby is generated a highly effective sonic wave projection.
>
> . . . .
>
> Provided by this invention are sonic wave generation elements of an electrostrictive driving device using polymeric material. The material is required to have a low modulus of about $10^7$ to about $10^8$ N/m$^2$, an apparent piezoelectric response with a sensitivity greater than about 1 Angstrom/V.

*Id.* at 21. In several of its claims, invention '979 identifies a variety of plasticized polymer materials which fall within the several classes of polymer materials described broadly and by nonexclusive example in the August 1990 proposal. The materials create the same phenomenon described in both the patent and the proposal as "electrostrictive" and "apparent piezoelectric response." Additionally, that phenomenon is generated by the same stimulus—a high DC bias voltage and a superimposed AC voltage. Therefore, as a matter of law, *see Johnston,* 885 F.2d at 1579–80, the court finds that there is a "close and umbilical connection" between invention '979 (including its 30 individual claims)

and Modification P00005. *See Technical Development Corp.,* 597 F.2d at 745.

## II. Conception or Reduction to Practice During the Pendency of a Government Contract

### A. Independent Claims 1, 10, and 18

#### 1. Conceived in the Performance of the Contract

■ An invention is conceived "when a definite and permanent idea of an operative invention, including every feature of the subject matter sought to be patented, is known." *Pfund v. United States,* 40 Fed.Cl. 313, 334 (1998) (quoting *Sewall v. Walters,* 21 F.3d 411, 415 (Fed.Cir.1994)). The parties agree that the "April 20, 1990 disclosure is the *first complete* written description of the invention claimed by the *independent claims* of the '979 patent." Def.'s Proposed Findings at ¶¶ 36, 40 (uncontested by Pl.'s Statement of Genuine Issues) (emphasis added). The court finds that the parties' agreement satisfies the requirements of a conception, and the court further finds that the independent claims of patent '979 were conceived by April 20, 1990.

■ Because the original version of contract '122 states on its face that the period covered by the contract was April 1, 1988, through September 30, 1990, *see* Def's App. at 238, the court concludes as a matter of law that the independent claims—claims 1, 10, and 18—were conceived during the time period covered by original contract '122. However, because the scope of original contract '122 did not include patent '979 technology, *see* discussion *supra* at part I, the independent claims were not conceived "in the performance of" the terms of the original contract. Consequently, the court must look to Modification P00005 to determine if the original claims were conceived or first reduced to practice in performance of modified contract '122.

Modification P00005 states unambiguously that the modification became effective on November 15, 1990, nearly seven months after the documented conception of the independent claims. Def.'s App. at 271. Therefore, the court finds that claims 1, 10, and 18 of

patent '979 were conceived before the effective date of modification P00005, and were not conceived "in performance of the contract."

## 2. Actual Reduction to Practice

The government can establish contractual entitlement to a license in the independent claims and obtain summary judgment as to those claims if there is no material question that they were first actually reduced to practice between November 15, 1990, and the termination of contract '122.

In the Defendant's Proposed Findings of Uncontroverted Fact, the government conceded that "[t]he invention referred to in ¶ 36 was reduced to practice during tests arranged by DARPA and ONR at BBN Laboratories in Cambridge, Massachusetts."[6] Def.'s Proposed Findings at ¶ 38. Paragraph 36 of the proposed findings states: "In October of 1989, in response to an inquiry from a DARPA employee, Professors Scheinbeim and Newman conceived the invention which eventually resulted in the *independent claims* of the '979 invention." *Id.* at ¶ 36 (emphasis added). Rutgers responded to the proposed finding by stating: "Concerning reduction to practice of the independent claims ('the invention'), *see* Opposition Brief at 34–35 and record citations therein." Pl.'s Statement of Genuine Issues at ¶ 38. The cited pages from Rutgers' brief argue:

> As to the entire '979 patent, and more specifically the independent claims that describe a device for driving a polymeric material in an electrostrictive mode to produce sonic waves, there is abundant evidence to create a genuine issue for trial as to whether a reduction to practice occurred *under a government contract.*

Pl.'s Opp'n to Def's Mot. for Summ. J. or in the Alternative Partial Summ. J. at 34–35 (emphasis in original). Rutgers does not deny that the independent claims were reduced to practice, but only contends that the claims fall outside the scope of contract '122. *See id.* Therefore, for purposes of the motion for summary judgment, the court finds that the independent claims—claims 1, 10,

and 18—were reduced to actual practice between February and April of 1990. Since that period predates the effective date of Modification P00005, the court holds that claims 1, 10, and 18 were not actually reduced to practice in the performance of contract '122, the government is not entitled under the contract to a license in them, and the motion for summary judgment must be denied as to those claims.

## B. Dependent Claims

If the government can carry its burden of proving that a dependent claim of patent '979 was either conceived or first actually reduced to practice in the performance of modification P00005, then the government is entitled to a license in that individual claim. *See Gould,* 579 F.2d at 573 (government entitled to license in individual patent claims if first actually reduced to practice under government contract), 576 ("each claim of a patent is a separate and distinct invention"); *see also Technical Development,* 597 F.2d at .746–47 (government entitled to license if it proves conception or first actual reduction to practice in performance of government contract). The government's motion for summary judgment argues that it is entitled to at least partial summary judgment because some of the dependent claims were first actually reduced to practice during the effective period of Modification P00005.

 "The defendant bears the burden of proof on the license defense and must establish ... that a conception or a first actual reduction to practice occurred in the performance of a Government contract." *Technical Development,* 597 F.2d at 746. If the government satisfies this showing, then the burden shifts to Rutgers to prove that first reduction to practice occurred prior to the date the contract was awarded. *Id.* at 747. "The proof of conception and/or reduction to practice is a heavy one for either party and requires more than self-serving testimony or uncorroborated records and documents." *Id.* at 747.

---

6. It is not disputed that those tests occurred during February, March, and April of 1990. *See*

Def.'s App. at 103; Def.'s Reply to Pl.'s Opp'n to Def.'s Summ. J. Mot. at 9–10.

### 1. Conceived in the Performance of the Contract

The government does not allege, much less provide the necessary supporting evidence to prove by undisputed facts, that any of the dependent claims of patent '979 were conceived on or after November 15, 1990. Therefore, the court cannot find that the dependent claims were conceived in the performance of modification P00005.

### 2. Actual Reduction to Practice

■■■ Actual reduction to practice requires proof that the inventor had "constructed an embodiment or performed a process that met all of the limitations" of the patent claim and "determined that the invention would work for its intended purpose." *Cooper v. Goldfarb*, 154 F.3d 1321, 1327–28 (Fed.Cir.1998). In this case, the government fails to carry its burden, stating in conclusory fashion:

> Summary judgment is appropriate with respect to claims 5, 6, 7, 13, 23, 24, and 25 of the '979 patent (the polyurethane claims) since Rutgers concedes that the actual reduction to practice of the inventions embodied in these claims occurred during tests which were conducted at Rutgers over a period of several weeks and completed on or about June 6, 1991. ( [Def.'s App. at] 105). Summary judgment is also appropriate with respect to claim 28, since this claim involves a polymer material which is nonpiezoelectric and it appears that the first time plaintiff reduced to practice such an invention was when the polyurethane claims were reduced to practice.

Def.'s Mot. for Summ. J. at 20. The single citation in support of this conclusion refers to plaintiff's response to an interrogatory asking for the date of "actual reduction to practice of the invention(s) of claims 5, 6, 7, 13, 23, 24, and 25 (involving polyurethane [7] and polyurea)." Def.'s App. at 105. Plaintiff responded: "Initial testing of polyurethane in a test set up at Rutgers to measure its electrostrictive response was conducted over a period of several weeks and completed on or about June 6, 1991." *Id.* When asked whether the tests were successful, plaintiff referred to relevant documents in a notebook that had already been produced to the government. *Id.* Plaintiff's responses did not mention testing polyurea or polymers using a combination of urethane and urea groups.

In the context of the government's interrogatories, plaintiff's responses imply that the dependent polyurethane claims—claims 5 and 23—were actually reduced to practice under modification P00005, but they are nevertheless ambiguous because they speak only of "initial testing." *See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 35. The ambiguity is increased by plaintiff's uncommitted response to the question whether the polyurethane tests were considered successful. *See* Def.'s App. at 105. The court holds that plaintiff's ambiguous responses to the government's interrogatories do not satisfy the government's heavy evidentiary burdens of showing (1) that the polyurethane tests embodied an invention or performed a process that met all of the limitations described in any of the dependent patent claims, or (2) that the embodiment or process actually worked for its intended purpose. *See Cooper*, 154 F.3d at 1327–28. Therefore, the court cannot find that claims 5, 6, 7, 13, 23, 24, 25, or 28 were first actually reduced to practice during the effective period of modification P00005. *See Technical Development*, 597 F.2d at 747 (self-serving statements and uncorroborated documents and records are insufficient to carry heavy burden of proof). Therefore, the court denies the government's motion for partial summary judgment.

### CONCLUSION

After careful consideration of the pleadings and evidence presented, the court finds, for the reasons expressed above, that the gov-

---

[7]. Only claims 5 and 23 identify polyurethane as the electrostrictive polymer used. Def.'s App. at 23–24. Claims 6 and 24 specify polyurea; claims 7 and 25 employ a polymer made from urethane and urea groups; and claim 13 uses a "polymeric material ... from the group consisting of polyurethane, polyurea and polymers having a combination of urethane and urea groups." *Id.*

ernment has failed to establish that it is entitled to summary judgment or partial summary judgment. Therefore, the Defendant's Motion for Summary Judgment or in the Alternative Partial Summary Judgment is denied.

The parties shall confer and jointly inform the court within three weeks of the filing of this order of their proposed recommendation(s) as to how to proceed.

**IT IS SO ORDERED.**