**ALLSTATES AIR CARGO, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 96–482C.**

United States Court of Federal Claims.

Oct. 16, 1998.

Paul O. Jolis, Washington, DC, for plaintiff. David T. Rallo, Chicago, IL, of counsel.

Agnes M. Brown, Washington, DC, with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen, and Assistant Director Anthony H. Anikeeff, for defendant.

## ORDER

MOODY R. TIDWELL, III, Senior Judge.

Plaintiff Allstates Air Cargo, Inc. (Allstates), an air freight forwarder, seeks payment of set-offs withheld by the government as penalties for late shipment deliveries. On April 20, 1998, the government filed Defendant's Motion for Summary Judgment. Plaintiff opposed the motion and on May 19, 1998, filed Plaintiff's Motion to Strike the results of an informal and inconclusive survey submitted as an appendix to Defendant's Motion for Summary Judgment. On May 20, 1998, Allstates filed Plaintiff's Motion for Summary Judgment. For the following reasons, the court will grant Plaintiff's Motion to Strike, and will deny the cross motions for summary judgment.

1. Most of the facts in this case are not in controversy, as is shown by the proposed findings of fact submitted by both parties. *See* Def.'s Pro-

## BACKGROUND

On December 20, 1991, the Department of Defense (DOD), through its Military Traffic Management Command (MTMC), solicited tenders from air freight forwarders interested in moving freight from Columbus, Ohio, to points throughout the contiguous United States.[1] After submitting tender number 600,005 (tender), Allstates was eventually selected as the prime carrier, effective April 12, 1992. Supplemental tenders ultimately extended the expiration date through October 31, 1994.

The government and Allstates agree that the terms of the agreement between Allstates and the government were contained in the tender. Item 24 defines several of the terms central to the dispute in this case:

a. Overnight Service—Door-to-door service with packages scheduled to be delivered to the consignee's address by 5:00 p.m., local time, on the following day after pickup or tender of shipment.

b. Second Day Service—Door-to-door service with shipments scheduled to be delivered to the recipient[']s address by 5:00 p.m., local time, on the second business day after pickup or tender of shipment.

. . . .

d. On–Time Delivery—For the purpose of this solicitation an on-time delivery will be understood to include delivery of the shipment intact, without loss or damage in the prescribed time. Partial deliveries, damaged elements, and shipments not reported will be construed as late deliveries. A 95% on-time delivery performance will be required.

Item 26 required Allstates "to provide daily scheduled pickups and deliveries at the direction of the Government," with a "present schedule" providing for "1 pickup daily" on Mondays through Fridays, Saturdays, Sundays, and Holidays. "Normal delivery service" was "considered as being Monday through Saturday no later than 5 p.m." There is no evidence that the government had subsequently directed Allstates to modi-

posed Findings of Uncontroverted Fact (Def.'s Proposed Findings); Pl.'s Proposed Findings of Uncontroverted Fact (Pl.'s Proposed Findings).

fy the "normal" schedule. For shipments requiring delivery at a "specific delivery time requested by the shipper," Allstates was to be entitled to an additional $125.00 per package.

Late shipments were to be paid at a rate of 50 percent of the normal scheduled rate. Under Item 29(d), however, Allstates was not to be penalized for excused late delivery:

> When through no fault of the carrier, the consignee is unable to accept the shipment when it is offered for delivery, the carrier agrees to hold the shipment until the next business day or a mutually agreed upon date. Carrier will annotate the delivery receipt with the time/date consignee was notified that shipment was available and the person and telephone number of the individual who declined delivery. This information will be supplied to the shipper, on a continuing basis, at no additional cost.

According to Allstates' former Controller and Chief Financial Officer, Jeffrey Musoff, before Allstates attempted to physically deliver each shipment to a military installation, an Allstates agent would telephone the installation to learn if it was available to accept shipments that day. If the installation responded that it would not accept shipments up until 5:00 p.m., the Allstates agent "recorded the early[ ]closing information, along with the time of the call and the name and telephone number of the person who furnished the early closing information, on an Alert Notice."

Allstates submitted Weekly Proof of Delivery Reports (weekly reports) listing all shipments made during the week by shipment number, and stated the shipment date, the due date, and the actual delivery date. If a receiving installation had made timely delivery impossible because it closed prior to 5:00 p.m., the weekly reports also informed the government of the date that delivery was offered, the actual closing time of the receiving facility, and the name (first, last, or both) and phone number of the person who stated the closing time. This procedure was followed for two and one-half years without objection from the government.

In 1994, the General Services Administration (GSA) began to audit government bills of lading (GBLs) handled by Allstates under the tender. GSA concluded that Allstates had been overpaid on more than 4,860 deliveries made between April 1992 and November 1994 because the deliveries were late and Allstates had been paid the full rate rather than the prescribed 50 percent rate for late deliveries. The government asserted overcharges and, by May 28, 1996, had withheld approximately $250,000 as set-offs. On March 24, 1995, Allstates sought administrative review from GSA in an effort to recover the set-offs and, when that failed, appealed to the Comptroller General of the United States. After reviewing "detailed documentation [submitted by Allstates] on six sample transactions," the Comptroller General decided that "Allstates should not be penalized for deliveries it can show it attempted prior to 5:00 p.m. on specified dates of delivery." The Comptroller General also concluded, however, that Allstates should support its claim with further documentation. The case was remanded to GSA for Allstates to provide "the records required by item 29d" so that "GSA c[ould] determine whether the delay was excusable." On remand, Allstates provided Alert Notices and Weekly Proof of Delivery Reports to document its claims that late delivery was excused, but GSA found the evidence insufficient. On August 7, 1996, Allstates filed a complaint in this court requesting payment of the set-off amounts withheld. By May 28, 1998, the amount totaled more than $356,228.72.

On April 20, 1998, the government filed its motion for summary judgment. In the Defendant's Appendix, the government included the affidavit of Carroll E. Calvert, a GSA employee who helped survey thirty of the Alert Notices "to determine the accuracy of the information recorded on them." Calvert found that many of the persons listed on the Alert Notices "were not listed as being involved with receiving shipments at the stations or depots," most of the phone numbers listed did not correspond to the person responsible for air cargo freight, and some installations received shipments as late as 9:00 p.m. Carroll concluded that the "amount of incorrect information shown by the carrier

on these sheets rendered the survey inconclusive."

On May 19, 1998, Allstates filed a motion to strike Carroll's affidavit and all references to it in the pleadings. The following day, Allstates filed its motion for summary judgment.

## DISCUSSION

### I. Motion to Strike

 Plaintiff asks the court to strike Calvert's affidavit, asserting that it is inadmissible hearsay. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801 (1997). "Hearsay is not admissible except as provided by these rules [Fed.R.Evid.] or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress." Fed.R.Evid. 802 (1997).

Survey results offered as proof of the matter asserted are hearsay, and thus the results of a survey, and any testimony based on those results, cannot be admitted into evidence unless the survey falls into a recognized class exception to the hearsay rule or into the residual exception contained in Fed.R.Evid. 803(24) [now Fed. R.Evid. 807].

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 516 n. 14 (3d Cir.1998); *see also Pittsburgh Press Club v. United States,* 579 F.2d 751, 757–58 (3d Cir.1978). Survey evidence satisfies the required showing of trustworthiness if, *inter alia,* the survey was "conducted according to generally accepted survey principles." *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.,* 82 F.3d 1533, 1544 (10th Cir.1996); *see also Pittsburgh Press Club,* 579 F.2d at 758 (circumstantial guarantees of trustworthiness generally met if poll is conducted in accordance with generally accepted survey principles, and results are used in statistically correct way). The *Manual for Complex Litigation* states that when survey data is offered about a population for its truth, then

the reliability and validity of estimates about the population derived from sampling are critical. The methods used must conform to generally recognized statistical standards. Relevant factors include whether:

- the population was properly chosen and defined;
- the sample chosen was representative of that population;
- the data gathered were accurately reported; and
- the data were analyzed in accordance with accepted statistical principles.

*Manual for Complex Litigation, Third,* § 21.493 (1995). Additionally, "the persons conducting the survey must be experts." *Brokerage Concepts,* 140 F.3d at 516 n. 14 (quoting *Pittsburgh Press Club,* 579 F.2d at 758); *see also Manual for Complex Litigation, Third,* § 21.493 ("Laying the foundation for such [survey] evidence will ordinarily involve expert testimony"). Courts have also required that the survey be conducted independently of attorneys involved in the litigation; recommended that interviewers or sample designers be trained and, ideally, unaware of the purposes of the survey or litigation; and concluded that respondents to the survey must be similarly unaware. *Pittsburgh Press Club,* 579 F.2d at 758; *see also Brokerage Concepts,* 140 F.3d at 516 n. 14 (proof of objective surveying methodology required). *But see Harolds Stores,* 82 F.3d at 1544 ("Technical and methodological deficiencies in the survey, including the sufficiency of the universe sampled, bear on the weight of the evidence, not the survey's admissibility"). The proponent of the survey evidence bears the burden of establishing the elements of admissibility. *Brokerage Concepts,* 140 F.3d at 516 n. 14; *Pittsburgh Press Club,* 579 F.2d at 758.

 In this case, the survey evidence presented by the government fails to qualify as admissible hearsay under Rule 807 because it lacks the requisite circumstantial guarantees of trustworthiness. The government does not argue that either of the two individuals who selected the sample, formulated the questions, contacted the respondents, and analyzed the results had any special training or expertise in conducting a scientific survey.

To the contrary, the government concedes that Mr. Calvert admitted that, other than on-the-job training, he had no formal instruction or educational background in conducting surveys or statistical analysis.

The government also fails to demonstrate that a representative sample population was properly chosen and defined, that data was gathered accurately and objectively, and that the results were determined in accordance with accepted statistical principles. The government's failure to carry its burden of proof on these factors is reason alone to deny admission of the survey evidence. *See Brokerage Concepts*, 140 F.3d at 516 n. 14 (proponent of survey evidence bears burden of establishing elements of admissibility); *Pittsburgh Press Club*, 579 F.2d at 758. The government removes all doubt that the survey evidence is inadmissible when it concedes that the "informal investigation was far from a formal scientific survey." Def.'s Opp'n to Pl.'s Mot. to Strike at 7. In doing so, the government essentially admits that the survey evidence lacks the circumstantial guarantees of trustworthiness necessary to qualify as admissible hearsay under Rule 807. Therefore, the court will grant plaintiff's motion to strike the survey evidence.

"[I]t follows that the evidence based on the survey should [be] excluded as well." *Pittsburgh Press Club*, 579 F.2d at 760. Therefore, the court will also grant plaintiff's motion to strike Calvert's affidavit and all references to the affidavit and the survey. Because the survey evidence and Calvert's affidavit are inadmissible, they are entitled to no weight on a motion for summary judgment. *Joe Regueira, Inc. v. American Distilling Co.*, 642 F.2d 826, 830 (5th Cir.1981). Consequently, the court will not consider such evidence as it decides the merits of the motions for summary judgment.

## II. Cross Motions for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* RCFC 56(c); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986). A fact is material if it might significantly affect the outcome of the suit under the governing law. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In deciding a motion for summary judgment, the role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. 2505.

The party moving for summary judgment bears the initial burden of demonstrating the absence of evidence to support the nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of supporting evidence, then the burden shifts to the nonmoving party to show that a genuine factual dispute exists. *See id.; Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed.Cir.1987) (quoting *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548).

The court must resolve factual disputes in favor of the party opposing summary judgment. *See Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed. Cir.1985). The non-movant is also entitled to the benefit of all presumptions and inferences. *See H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984).

"It is well settled that the interpretation of a contract is a question of law." *Rutgers v. United States*, 41 Fed.Cl. 764, 769 (Fed.Cl. 1998) (quoting *Ceccanti, Inc. v. United States*, 6 Cl.Ct. 526, 528 (1984)); *Omni Corp. v. United States*, 41 Fed.Cl. 585, 590 (Fed.Cl. 1998); *Hughes Communications Galaxy, Inc. v. United States*, 998 F.2d 953, 957 (Fed.Cir.1993). Because questions of contract interpretation are issues of law, they may generally be decided on summary judgment. *Rutgers*, 41 Fed.Cl. at 769–70; *Omni*, 1998 WL 525445, at *5.

### A. Delivery Due Before Closing Time

■ The government argues that, in order to provide timely delivery service, Allstates had to have delivered shipments to the consignee installation prior to the time that the installation closed, even if the installation receiving department closed before 5:00 p.m.

The government further argues that "if an installation did not have 'normal' hours, then the carrier should have scheduled a delivery time if it could not deliver prior to closing." The court disagrees.

Under the tender, unless delivery at a specified time is specifically requested and paid for by the shipper, delivery would be timely if it occurred before 5:00 p.m. on the desired delivery date. Item 24 defines "On–Time Delivery" as delivery "in the prescribed time." The prescribed time depends upon whether the shipper requests "Overnight Service," defined as scheduled delivery "to the consignee's address by 5:00 p.m." on the business day after pickup, or "Second Day Service," defined as scheduled delivery "to the recipient's address by 5:00 p.m." on the second business day after pickup or tender of shipment. Item 26(d) established a default delivery schedule, stating that "[n]ormal delivery service will be considered as being Monday through Saturday no later than 5 p.m." The tender does not obligate Allstates to modify this default schedule on its own, and there is no evidence that the government requested modification of this 5:00 p.m. default. Furthermore, Item 28 entitles All-states to an additional $125.00 charge for each shipment with a "specific delivery time requested by the shipper," and only about five shipments in the solicitation were expected to require same-day service or delivery at a specified time. Therefore, the government's argument that Allstates should have scheduled a delivery time earlier than 5:00 p.m. is contrary to the terms of the tender and is consequently without merit.[2]

## B. Implied Duty of Good Faith and Fair Dealing

■ The government argues that because timely delivery is essential to an expedited delivery service contract, failure to de-liver shipments to an installation before it closed is a breach of Allstates' duty of good faith and fair dealing in the performance and enforcement of the contract. The government correctly assumes that the implied duty of good faith and fair dealing applies in government contracts. *Ebasco Servs., Inc. v. United States*, 37 Fed. Cl. 370, 382 (1997) ("Every government contract contains an implied covenant of good faith and fair dealing"); *Solar Turbines, Inc. v. United States (Solar Turbines II)*, 26 Cl.Ct. 1249, 1273–74 (1992) (duty of good faith and fair dealing, defined by *Restatement (Second) of Contracts* § 205, is applicable to federal government contracts). "However, while this duty exists, it must be applied with great care." *Solar Turbines II*, 26 Cl.Ct. at 1274. "The implied obligation of good faith and fair dealing must attach to a specific substantive obligation, mutually assented to by the parties." *State of Alaska v. United States*, 35 Fed. Cl. 685, 704 (1996), *aff'd*, 119 F.3d 16 (Fed.Cir. 1997), *and cert. denied*, —— U.S. ——, 118 S.Ct. 1035, 140 L.Ed.2d 102 (1998). Furthermore, the duty "must not be interpreted so broadly as to inhibit a party from maximizing its benefits through aggressive enforcement of its contract rights." *Solar Turbines II*, 26 Cl.Ct. at 1274 (quoting *Solar Turbines, Inc. v. United States (Solar Turbines I)*, 23 Cl.Ct. 142, 156 (1991)). For example, the court has held that it is "unwilling to infer a good-faith limitation" where "the contracts already include a significant, bargained-for limitation," even where that limitation is as significant as restraining one party's freedom to bargain for a commodity's price. *Barseback Kraft AB v. United States*, 36 Fed. Cl. 691, 706 (1996), *aff'd*, 121 F.3d 1475 (Fed.Cir.1997).

■ In promoting its argument, the government overlooks the "bargained-for" terms of the tender. In the name of "good faith

2. The government argues that construing the tender to allow delivery at any time before 5:00 p.m. on the due date would render the phrase "daily scheduled pickups" meaningless. The argument is flawed because it is taken out of context. Item 26(a) states: "Carrier agrees to provide daily scheduled pickups and deliveries at the direction of the Government. The present schedule provides for ... 1 pickup daily" on every day of the week, including holidays. But no "present schedule" for delivery is provided, except that Item 26(d) defines "normal delivery service" as delivery by 5:00 p.m. Because there is no evidence that the government directed a delivery schedule other than delivery before 5:00 p.m., the court finds that Item 26 does not require Allstates to have assured that delivery occurred before an installation's closing time if it closed before 5:00 p.m.

and fair dealing," the government would compromise Allstates' contractual rights by demanding (1) early delivery despite the clear terms of Item 26(d) giving Allstates until 5:00 p.m. of the delivery due date to deliver normal shipments, and (2) delivery at a specific time, a service for which Allstates would be entitled to an additional $125.00 per shipment under Item 28. Therefore, the court holds that the government's theory, that Allstates failed to fulfill its obligation to act fairly and in good faith, not only lacks a basis in a specific substantive obligation, but also would inhibit Allstates from maximizing its "bargained-for" benefits under the contract.

### C. Duty to Produce Actual Receipts Signed by Consignee Agent

The government complains that the documents Allstates proffered as evidence of excusable delay were insufficient under Item 29(d). The government asserts that either a carrier's shipment waybill or a GBL had to have been signed by the consignee upon delivery, then presented to the government in order to corroborate Allstate's claim that the installation had been unable to accept the shipment when it was offered for timely delivery. The court disagrees.

■ The government and Allstates concur that the "terms and conditions of the agreement between Allstates and the DoD were contained in Tender No. 600,005." Item 29(d) contemplates that the "[c]arrier will annotate the delivery receipt with the date/time consignee was notified that shipment was available and the person and telephone number of the individual who declined delivery" (emphasis added). As the carrier, Allstates is to have created the documentation, and there is no requirement that consignee's signature be affixed to the receipt. Furthermore, Item 29(d) states that "[t]his information [person, phone number. date, and time] will be supplied to the shipper[ ] on a continuing basis" (emphasis added). In light of the fact that Item 29 is captioned "Proof of Delivery Reports," the language of the tender suggests that Allstates was required only to supply reports containing the information—rather than produce actual annotated

and signed waybills or GBLs—in order to establish the right to full payment when the consignee had frustrated Allstate's ability to deliver shipments by 5:00 p.m. (emphasis added). Therefore, the court holds that the government erred in its argument that Allstates had to submit actual receipts or the signature of a consignee's agent in order to be paid the full shipping rate for late deliveries excused by the government.

### D. Sufficiency of Alert Notices

■ The government asserts that Allstates never submitted the documentation required by the tender to substantiate plaintiff's claim. The available record generally indicates otherwise. Allstates asserts in paragraph 16 of its proposed findings, that for two and one-half years it had

> submitted a Weekly Proof of Delivery Report to the shipper for every shipment of freight which it had made during the previous week, and in every case where installations closed prior to 5:00 p.m. Allstates recorded the actual closing time, the name of the person who furnished the closing time, and that person's telephone number.

Plaintiff also asserts in paragraph 24 of its proposed findings, that after the government audited Allstates' GBLs and complained of overcharges, Allstates supplemented the weekly reports with Alert Notices for the GBLs in question. The record supports these alleged facts, for both the government and plaintiff have submitted sample weekly reports and sample Alert Notices which include the information described by plaintiff.

The government does not challenge the fact that weekly reports and Alert Notices were submitted for each shipment. Instead, the government makes three arguments in an attempt to either discredit plaintiff's evidence or challenge its sufficiency under the terms of the tender. First, the government argues that Calvert's survey was unable to verify the contacts listed on Alert Notices prepared by Allstates—essentially challenging the accuracy of the information supplied on the weekly reports. However, because the court granted Allstate's motion to strike Calvert's affidavit, the government is without admissible evidence capable of creating a

genuine issue of fact as to the accuracy of the information, and the government's first objection evaporates.

Second, the government argues that identifying the person who declined delivery by first or last name only was insufficient to satisfy the terms of the tender agreement. As a question of contract interpretation, this is an issue of law capable of disposition on summary judgment. *See Rutgers*, 41 Fed.Cl. at 769–70.

The terms of the tender do not require Allstates to provide both first and last names. Item 29(d) states that the carrier must "annotate the delivery receipt with . . . the person," but this is a literal impossibility. *See Black's Law Dictionary* 1028 (5th ed.1979) ("person" defined generally as "a human being," though statute sometimes defines term to include organizations). Consequently, Item 29(d) is ambiguous, requiring the court to interpret the meaning of the term "person."

The government correctly concedes that "[t]he language contained in the tender was drafted by the Government. Therefore, pursuant to the doctrine of *contra proferentum*, any ambiguous term must be construed by this Court against the drafting party. *S.W. Aircraft, Inc. v. United States*, 551 F.2d 1208, 1212, 213 Ct.Cl. 206 ( Ct.Cl.1977)." *See also Park Village Apartments v. United States*, 32 Fed. Cl. 441, 446 n. 3 (1994) (citing *S.W. Aircraft* with approval), *aff'd*, 152 F.3d 943 (Fed.Cir.), *petition for cert. filed*, 67 U.S.L.W. 3106 (U.S. Aug. 3, 1998) (No. 98–217); *Norwood Mfg., Inc. v. United States*, 21 Cl.Ct. 300, 305 (1990) (quoting *S.W. Aircraft* with approval), *aff'd*, 930 F.2d 38 (Fed. Cir.1991). In this case it is not unreasonable to interpret the ambiguous phrase "annotate the delivery receipt with. . . . the person" to mean Allstates was to identify the person by writing the name on the delivery receipt. Nor is it unreasonable to find that a first or last name, accompanied by a telephone number at which the person had actually been contacted, would satisfactorily identify the person who declined delivery of the ship-

ment. Therefore, after construing the ambiguous contractual term against the government, the court holds that Allstates' failure to include both the first and last name does not render the "information" incomplete under Item 29d.

Finally, the government pointed out that GSA had found Allstates' supplemental documentation to be insufficient to support its claim. But this objection, which focuses on the GSA's legal interpretation of the supplemental documentation, implicitly concedes the fact that Allstates had submitted the weekly reports and supplemental Alert Notices as alleged. Therefore, for the purpose of disposing of the cross motions for summary judgment, the court finds that Allstates has submitted to the government a copy of the Alert Notice corresponding to each of the GBLs challenged by the government.[3]

The question now becomes whether the weekly reports and Alert Notices satisfy the requirements of Item 29(d). Item 29(d) entitles Allstates to full payment for a "late" shipment if Allstates has provided the government with the name (first, last, or both) of the person who excused timely delivery, the person's phone number, and the date and time that the conversation occurred. Both Allstates and the government submitted evidence in their appendices which tends to prove that Allstates provided the information required by Item 29(d) for most, but not all, of the GBLs for which set-offs have been withheld.

First, it should be noted that the weekly reports are insufficient to satisfy Item 29(d) on their own because entries for the excused late deliveries state only the time that the receiving installation was to close, without indicating the time that the conversations with the installation took place. The time of the conversation is a material fact in determining whether Allstates fulfilled its contractual obligations because it indicates whether the shipment was available for delivery to the installation by 5:00 p.m. when delivery was due. Therefore, without more, the court can-

---

**3.** This finding is further buttressed by the fact that the government has submitted to the court, as part of the appendix to its motion, almost 50

Alert Notices supplied to the government by Allstates.

not find that the weekly reports are sufficient to satisfy the requirements of Item 29(d).[4]

The question now becomes whether the Alert Notices supplied by Allstates satisfy Item 29(d). This determination must be made based upon the samples supplied to the court by both parties. All but one of the forty-eight Alert Notices appearing in the government's appendix identify by first or last name the person who declined delivery, the person's phone number, and the date and time that Allstates notified the consignee that the shipment was available for delivery. The one incomplete Alert Notice in the government's appendix (GBL # C4238334) fails to identify the time that the consignee was notified that shipment was available.

In Plaintiff's Appendix, Allstates submitted 99 sample Alert Notices. All but two (GBL # # C4174827, 4174825) contain the phone number and the first or last name of the person who declined delivery, as well as the date and time of the conversation. Both of the incomplete Alert Notices report that the scheduled delivery date was changed once and that delivery was declined by the installation once. All of the information required by Item 29(d) appears on the Alert Notices concerning the declined delivery, but there is no phone number or time of conversation noted for the changed delivery due date.

Those Alert Notices which contain the name (first, last, or both) and phone number of the person who declined timely delivery before it was due, and the date and time that the conversation occurred, establish Allstates' right to full payment for the corresponding GBLs. Therefore, the court holds that Allstates is entitled to the full amount of the rate offered in the tender for all late shipments for which Allstates has produced an Alert Notice containing the information required by Item 29(d). However, the court is unable to determine how many of the more than 4,860 disputed GBLs are documented with Alert Notices which supply the requisite information. Because the examples provided by both parties demonstrate that some of the Alert Notices are insufficient, and the court has no way of determining precisely how many more Alert Notices are similarly inadequate, there is a genuine material issue of fact which must be determined before the court can decide the extent to which plaintiff is entitled to relief. Since summary judgment is only appropriate in cases where are no genuine issues of material fact, *see* RCFC 56(c); *Anderson,* 477 U.S. at 247, 106 S.Ct. 2505, the court must deny the motions for summary judgment filed by both parties.

## CONCLUSION

After careful consideration of the pleadings and evidence presented, and for the reasons outlined above, the court holds that Plaintiff's Motion to Strike is *ALLOWED.*

Defendant's Motion for Summary Judgment is *DENIED.*

Plaintiff's Motion for Summary Judgment is *DENIED.*

The parties shall confer and, within three weeks of the filing of this order, jointly inform the court of the likelihood that this case will settle, and their proposed recommendation(s) as to how to proceed.

**IT IS SO ORDERED.**

4. It is arguable that, with some additional support, the weekly reports could be sufficient to prove timely attempted delivery, since the entries identify the time that the installation was to close on the delivery date and indicate that a conversation took place with the person named, suggesting that the conversation occurred before the closing time noted. Without evidence to support this interpretation, however, the court will not so find on a motion for summary judgment.