**CTA INCORPORATED, Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 97–864C.**

United States Court of Federal Claims.

Aug. 31, 1999.

---

Thomas A. Lemmer, Denver, CO, for plaintiff. Matthew F. Porter and Duncan Butts, Denver, CO, of counsel.

Franklin E. White, Jr., Washington, D.C., with whom were Assistant Attorney General Frank W. Hunger, and Director David M. Cohen, for defendant. Judith A. Bonner, General Services Administration, of counsel.

## ORDER

MOODY R. TIDWELL, III, Senior Judge.

## INTRODUCTION

Plaintiff CTA, Inc., claims that it is entitled to damages because the government improperly induced CTA to enter into a technical support services contract, breached the contract, and constructively changed the contract terms. Defendant filed a motion for summary judgment, and plaintiff responded with a cross-motion for summary judgment. After carefully considering the arguments and the voluminous record, the court will allow defendant's motion for summary judgment, deny plaintiff's cross-motion, and dismiss the complaint.

## BACKGROUND

On March 16, 1992, in anticipation of a solicitation to recompete an existing technical support services contract between the government and incumbent contractor Computer Data Systems, Inc. (CDSI), CTA requested information about the incumbent contract under the Freedom of Information Act (FOIA). The General Services Administration (GSA) responded on April 6, 1992, by providing the fully burdened hourly rates charged by CDSI for the various labor categories defined by the contract at that time.

On May 15, 1992, GSA issued Solicitation 3KC–92–AB04 (the Solicitation) asking for bids to provide "Automated Data Processing Technical Support Services" in New England, the Middle Atlantic states (except parts of Maryland and Virginia), the Virgin Islands, and Puerto Rico (Eastern Zone).

GSA's Information Resources Management Service (GSA/IRMS) acted as agent for various "client" agencies to meet the needs of the Federal Information System Support Program (FISSP), and GSA prepared the Solicitation to obtain the services necessary to perform work requests submitted by GSA and its clients. The scope of the contract included designing and creating information systems, training, support and maintenance, and clerical support. Among the development and maintenance services which the successful bidder had to be prepared to support, the Solicitation listed "[a]pplication software development using the fully integrated application development systems of integrated computer aided system engineering (I–CASE)." (Solicitation ¶ C.3.2.a.5). "I–CASE" was defined as:

Tools that allow full system life cycle integration of the functional analysis, joint requirements planning, the design, the implementation, and the maintenance of a system by means of a centralized encyclopedia and/or dictionary of analysis, design, and programming objects.

I–CASE tools allow for:

—joint requirements planning (JRP)

—integration of results of Joint Application Development (JAD)

—ongoing verification and validation for detection of errors and inconsistencies in analysis, design, and programming

—graphical depiction of all phases of life cycle development.

(Solicitation ¶ C.2.5).

The successful bidder was to be awarded a requirements contract (contract or CTA contract) with firm fixed labor rates effective for one year with four one-year options. The successful bidder was to continue providing services being supplied by CDSI under contract GS00K88AFD2631 (CDSI contract or predecessor contract).

The Solicitation asked bidders to propose fixed hourly rates for 27 different labor categories or "skill levels," in each of the five different geographical areas in the Eastern Zone. Hourly rates were also to distinguish between work performed "on-site" at govern-

ment facilities or "off-site" at the contractor's facilities. Bidders were to submit a set of proposed rates for the initial one-year contract term and each of the four option years.

The Solicitation explained that when work was ordered, GSA was to issue a task request which the contractor would use to prepare a proposal outlining how the contractor planned to perform the work, which skill levels would be used, and how many hours each skill level would work. GSA and the contractor would then negotiate a final proposal and GSA would issue a task order. The contractor was to be paid for the hours of work performed at the fixed rate proposed in the bid for the applicable skill level. Even though the Solicitation included I–CASE work within its scope, it did not define a skill level specifically for I–CASE work.

In paragraph C.4, the Solicitation listed a number of hardware and software environments which the successful bidder might have to use in performing the contract. Information Engineering Facility (IEF), an I–CASE tool developed by Texas Instruments, was not listed. The Solicitation also included estimates of the number of hours which would be ordered for each labor category in each of the five geographical regions within the Eastern Zone, but it repeatedly emphasized that it was "impossible to determine the precise types or amounts of services and products that will be ordered during the contract term."

The Solicitation also emphasized that it was important that the successful bidder be able to provide quality services through reliable and competent employees. The Solicitation incorporated FAR 52.222–46 (48 C.F.R. § 52.222–46 (Apr. 1984)) as paragraph L.18, which stated:

(a) Recompetition of service contracts may in some cases result in lowering the compensation (salaries and fringe benefits) paid or furnished professional employees. This lowering can be detrimental in obtaining the quality of professional services needed for adequate contract performance. It is therefore in the Government's best interest that professional employees ... be properly and fairly compensated. As part of their proposals, offerors will submit a total compensation plan setting forth salaries and fringe benefits proposed for the professional employees who will work under the contract. The Government will evaluate the plan to assure that it reflects a sound management approach and understanding of the contract requirements. This evaluation will include an assessment of the offeror's ability to provide uninterrupted high-quality work. The professional compensation proposed will be considered in terms of its impact upon recruiting and retention, its realism, and its consistency with a total plan for compensation. Supporting information will include data, such as recognized national and regional compensation surveys and studies of professional, public and private organizations, used in establishing the total compensation structure.

(b) The compensation levels proposed should reflect a clear understanding of work to be performed and should indicate the capability of the proposed compensation structure to obtain and keep suitably qualified personnel to meet mission objectives.... Additionally, proposals envisioning compensation levels lower than those of predecessor contractors for the same work will be evaluated on the basis of maintaining program continuity, uninterrupted high-quality work, and availability of required competent professional service employees. Offerors are cautioned that lower compensation for essentially the same professional work may indicate lack of sound management judgement [sic] and lack of understanding of the requirement.

(c) The government is concerned with the quality and stability of the work force to be employed on this contract. Professional compensation that is unrealistically low or not in reasonable relationship to the various job categories, since it may impair the contractor's ability to attract and retain competent professional service employees, may be viewed as evidence of failure to comprehend the complexity of the contract requirements.

The contract was to be awarded to the "responsible offeror whose proposal is most advantageous to the Government, price and

other factors considered. Proposals shall be evaluated based upon the technical factors ... and for price reasonableness." Solicitation ¶ M.1.

On September 25, 1992, CDSI, which was still performing under the predecessor contract, requested that a new skill level for Information Engineering Specialist (CDSI Skill Level 10) be added to the CDSI contract. One of GSA's clients, the United States Army, had requested work using IEF to support the Standard Army Ammunition System Modernization (SAAS–MOD) project at Fort Lee, Virginia. At the time, however, the CDSI contract did not have a skill level applicable to I–CASE work. On December 11, 1992, GSA issued Modification PS09 to the CDSI contract "add[ing] a skill level category titled Information Engineering Specialist (IES) assigned as Skill Level 10." The modification was made by the mutual agreement of CDSI and GSA. CDSI was to be paid $73.57 per hour on government sites and $77.49 on the contractor's site for I–CASE work done during the remainder of the contract term, and it was estimated that 12,550 hours of IES work would be required. Qualified IES employees were required to have the following credentials: ten years of continuous experience in application systems development, two years of intensive experience in applications requirements with successful I–CASE implementations, one year of successful experience in I–CASE tools, either a master's or doctorate degree in a computer-related field or I–CASE certification with a bachelor's degree, and in-depth training on I–CASE tools and methodology "for all IE [information engineering] development life cycle phases." The new skill level was framed broadly enough to encompass I–CASE work using IEF as well as other I–CASE tools.

On May 25, 1993, GSA issued Amendment 9 to the Solicitation. It added Information Engineering Specialist as a new Skill Level 29 which was essentially identical to the newly created CDSI Skill Level 10.

On August 31, 1993, Amendment 0014 deleted section C of the contract in its entirety and replaced it with a revised section C which consolidated the number of skill levels from 27 to 16. Former IES Skill Level 29 became Skill Level 16 and was renamed "I–CASE Engineer," but the educational, work experience, and knowledge requirements, as well as the skill description, remained essentially unchanged. The amendment also added IEF and at least two other I–CASE programs to paragraph C.4, the list of software which the successful bidder might have to use in performance of the contract. Amendment 14 ¶ C.4.1 (adding IEF, IEW, and ORACLE CASE).

On November 11, 1993, GSA issued Amendment 0018. By this time, the requirement in paragraph L.18, that offerors had to actually submit a total compensation plan as part of their bid, had been dropped. Instead, each bidder was to "certify that I fully comply with the requirements of clause L.18" by having prepared a proper and fair compensation plan which would assure the bidder's ability to provide an unbroken supply of high quality services. Furthermore, the statement that the "government will evaluate the [compensation] plan to assure that it reflects a sound understanding of the contract requirements" was stricken from paragraph L.18.a, and paragraph L.18.b likewise eliminated any reference to evaluation of the compensation plan.[1] Amendment 18 also removed a sentence from paragraph M.2 that formerly read: "Proposals will be evaluated in accordance with FAR Provisions 52.222–46 contained in Section L." However, paragraph M.1 continued to state:

> Proposals shall be evaluated based upon the technical factors described in Section L.15, and for price reasonableness....
>
> ....
>
> b. Evaluation of Price: The prices for skill levels will be evaluated for the skill levels involved. These relationships must be reasonable for the price proposal to be deemed acceptable. Also, skill

---

1. The fact that GSA included a reference to an evaluation of compensation levels in the Solicitation and then eliminated it in Amendment 18 gave actual notice to plaintiff that it could not rely on the government to evaluate its compensation levels. The newly drafted requirements placed the burden of formulating an acceptable plan squarely on the bidder.

level will be evaluated to ensure that they reasonably reflect an understanding of the work and skills required and the labor-market(s) involved, to allow for competent performance on this contract. The loaded hourly rates will be evaluated in arriving at the most advantageous offer to the Government.

Amendment 18 also provided rough estimates of the number of hours which might be ordered for each skill level in each geographical area during the one-year contract term and four optional terms. GSA estimated that in area 4, which included Fort Lee, Virginia, approximately 25,200 hours of Skill Level 16 work would be ordered during the first year. Estimated orders for I–CASE work in the remaining four areas totaled 16,800 hours during the first year. During the four optional years, it was estimated that all areas might require increasing amounts of on-site work, and that some areas might also require more off-site work.[2]

On November 17, 1993, CTA asked a number of questions about the Solicitation and Amendment 18. One question requested clarification of paragraph L.18.a, asking whether the "total compensation plan" would be evaluated. The government replied to the question by issuing Amendment 21 on December 14, 1993. The amendment answered:

By your signature you are certifying to the Contracting Officer that you comply with the requirements of the clause. Unless the [C]ontracting Officer has reason to believe otherwise, he will accept that certification. Therefore, you are required to have a plan that complies with the clause, but you are not required to submit the plan with your offer.

CTA had also asked a question about paragraph L.18.b, which stated that lower compensation for "essentially the same professional work" might indicate lack of judgment or understanding of the requirements. Plaintiff's question read:

The only offeror that can know precisely what compensation levels are currently being provided in the predecessor contract is the incumbent. Further, this type of information cannot be obtained under Freedom of Information Act (FOIA) requests. For offerors other than the incumbent, the current direct annual salaries and corresponding fringe benefits would need to be provided to all offerors to level out this requirement and provide the basis for which an offeror can certify to the provisions of RFP Section L.18.d. Would the GSA provide the direct annual salaries and corresponding fringe benefits from the incumbent contract?

The government responded by stating that the "fully burdened rates on the prior contract are public information."

The day after Amendment 21 was issued, one of CTA's competing bidders, Computer Sciences Corporation (CSC), submitted a FOIA request for the fully burdened rates under the CDSI contract. GSA promptly responded on December 20, 1993, by faxing CSC a copy of the effective labor rates for all skill levels, including the rates for CDSI Skill Level 10. CTA did not request or receive the labor rates for CDSI Skill Level 10.

On December 17, 1993, CTA submitted its Best and Final Offer (BAFO), even though BAFOs were not due until December 30, 1993. The certification that CTA had a realistic compensation plan was included with the BAFO, as required by paragraph L.18. For year one of the contract, CTA submitted bids ranging from $29.33 to $33.78 per hour for on-site Skill Level 16 work and from $30.86 to $35.55 per hour for off-site Skill Level 16 work, depending on the geographical area. The incomplete evidence of record shows that the government estimated that Skill Level 16 work would cost from $37.89 to

2. GSA estimates for the base and optional years totaled:

| | Base | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Area 4: | 25,200 | 27,468 | 30,008 | 32,853 | 36,039 |
| Areas 1–3, 5: | 16,800 | 18,060 | 19,470 | 21,050 | 22,820 |
| Total: | 42,000 | 45,528 | 49,478 | 53,903 | 58,859 |
| % of Total in Area 4: | 60.0% | 60.0% | 60.6% | 60.9% | 61.2% |

$49.26 per hour for on-site work in year one, depending on the area.[3] CTA's competitors bid from $32.02 to $38.91 per hour for Skill Level 16 on-site work in year one.

GSA accepted CTA's BAFO and awarded the contract to CTA on March 4, 1994. Between the time of award and December 1995, the government issued task orders to "perform follow-on IEF Technical Design and Construction/Testing" for the SAAS–MOD project at Fort Lee, Virginia. This project was a continuation of the task orders under the predecessor contract which had ordered IEF work under CDSI Skill Level 10. During the course of the contract, GSA ordered Skill Level 16 work only for the SAAS–MOD project, and all of the Skill Level 16 work ordered for SAAS–MOD required IEF expertise.

CTA alleges that it had difficulty filling the IEF positions ordered for SAAS–MOD. According to CTA's Director of Business Operations, John Henderson, CTA was able to hire only two persons with the requisite IEF experience, and was able to provide 12 more IEF experts through subcontracts and consulting relationships. By November 26, 1996, CTA had provided 27,304 hours of work under Skill Level 16 work, for which it was paid $899,566 at an average rate of $32.95 per hour. However, based on data provided by Henderson, CTA's cost of providing the labor (including fringe benefits and overhead for CTA employees) totaled $1,841,922.39, making the average hourly cost of providing Skill Level 16 work $67.46—more than twice the hourly rate CTA was paid. Henderson's data also indicated that CTA's costs plus profit (labor costs plus general and administrative expenses and profit) totaled $1,963,163.29, making CTA's average hourly "price" $71.90.[4] The difference between CTA's bid price and its costs of performing I–CASE work is at the heart of the current dispute.

In December 1995, GSA requested continuation and expansion of the SAAS–MOD task orders which required Skill Level 16 work. CTA declined the task as permitted by paragraph G.9 of the contract, which stated that the contractor was not required to honor orders exceeding $1.6 million. GSA transferred the I–CASE work to a scientific applications contract awarded to Signal Corporation on September 30, 1995. On December 12, 1995, Signal's contract was modified to add "IEF Information Engineer" as a new skill level to be paid at the loaded rate of $94.27 per hour.

On December 3, 1996, CTA submitted a certified claim to the Contracting Officer alleging that the government constructively changed the contract and failed to disclose superior knowledge about Skill Level 16. The Contracting Officer denied the claim in its entirety on February 14, 1997.

CTA filed its First Amended Complaint (Complaint)[5] on January 21, 1998, alleging that I–CASE workers with IEF experience are more expensive than non-IEF I–CASE workers and that CTA was damaged because the government improperly led it to believe that GSA would not order exclusively IEF work under Skill Level 16. The Complaint presents five counts: (I) breach of contract for fraud in the inducement, (II) breach of contract for failure to disclose superior knowledge, (III) breach of contract for misrepresentation, (IV) breach of paragraph L.18 of the contract, and (V) constructive change.

On January 4, 1999, defendant filed a motion for summary judgment, arguing that the government did not fail to disclose superior knowledge, did not misrepresent the contract requirements, did not breach paragraph L.18 of the contract, and did not constructively

---

**3.** The record includes CTA's bids for all skill levels, all geographical areas, and all years. Government estimates are included for all skill levels for year one in areas 1, 2, 4, and 5. Competitors' bids are included only for Skill Level 16 on-site work to be done during year one in areas 1, 2, 4, and 5.

**4.** Henderson stated that the average hourly price for all employees was $70.81, leaving a shortfall

of $38.10 for each hour of Skill Level 16 work performed under the contract. He also noted that the average hourly price for CTA's I–CASE employees was $44.09 and the average hourly price for I–CASE subcontractors and consultants was $76.53.

**5.** Plaintiff filed its initial complaint on December 29, 1997.

change the contract. Plaintiff responded on March 2, 1999, with a cross motion for summary judgment.

## ANALYSIS

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Allstates Air Cargo, Inc. v. United States*, 42 Fed.Cl. 118, 123 (1998). "A fact is material if it might significantly affect the outcome of the suit under the governing law." *Allstates*, 42 Fed.Cl. at 123; *see Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In this case, the court finds that there are no material issues of fact, and that defendant is entitled to judgment as a matter of law because plaintiff has failed to provide adequate evidence to support its claims.

### A. Duty to Notify Plaintiff That Its Bid Price Was Unrealistic

■ In Count IV, plaintiff claims that paragraph L.18 of the contract required the government to reject CTA's bid if CTA's proposed compensation rates were unrealistically low and would adversely affect its ability to recruit and retain personnel to perform work under the contract. Plaintiff also argues that paragraph L.18 required the government to reject CTA's certification of compliance with paragraph L.18 because the government had reason to believe that CTA's proposed compensation rates were unrealistically low for purposes of recruiting and retaining personnel.

Because questions of contract interpretation are issues of law, they are appropriately decided on summary judgment unless the contractual terms are inextricably intertwined with underlying issues of material fact. *See Rutgers v. United States*, 41 Fed. Cl. 764, 769 (1998). In this case, after reviewing the record in detail, the court finds no material issues of fact which are inextricably intertwined with the interpretation of paragraph L.18 or its related paragraphs.

The court further finds that the amended Solicitation did not require the government to have rejected CTA's proposal, nor did it mandate rejection of plaintiff's certification of compliance with paragraph L.18 under the circumstances.

The Solicitation and its amendments use language that permits the government to reject CTA's proposal if, in the government's discretion, the proposal is likely to jeopardize the government's negotiated right to high-quality, continuous service. In Amendment 18, the government notified bidders that "prices for skill levels will be evaluated" and that relationships between price and skill levels "must be reasonable." (Amendment 18 ¶ M.1.b). Thus, the government affirmatively stated that it would evaluate bids for price reasonableness. However, the government retained to itself the discretion to decide whether suspicious proposals would be rejected based on the results of that evaluation. Paragraph M.2 put offerors "on notice that any proposals which are ... unrealistically low in cost or price may be deemed reflective of an inherent lack of technical competence or indicative of failure to comprehend the complexity and risk of the contract requirements and may be grounds for the rejection of the proposal." (Amendment 18 ¶ M.2). Paragraph L.10 also used "may" when it stated that the government "may determine that an offer is unacceptable if the prices proposed are materially unbalanced." (Amendment 18 ¶ L.10.g). Even paragraph L.18 reflects the government's discretion when it states that a bidder's decision to pay less for the same work done under the predecessor contract "may indicate lack of sound management judgement [sic] and lack of understanding of the requirement," (Amendment 18 ¶ L.18.b); unrealistically low pay rates "may be viewed as evidence of failure to comprehend ... contract requirements," (Amendment 18 ¶ L.18.c); and failure to comply with paragraph L.18 "may constitute sufficient cause to justify rejection of a proposal," (Amendment 18 ¶ L.18.d).

Repeated use of the word "may" rather than "shall" or "will" denotes discretion.[6]

6. The original Solicitation also provided the gov-

ernment discretion in deciding whether evidence

*See Peoria Tribe of Indians of Oklahoma v. United States,* 177 Ct.Cl. 762, 369 F.2d 1001, 1005 (1966) (use of word "may" denotes discretion to pursue alternative courses of action), *rev'd on other grounds,* 390 U.S. 468, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968). Therefore, after the contracting officer had considered whether CTA's compensation plan appeared realistic, the officer could decide, in his discretion, whether compensation levels were so suspiciously low that they would likely impair the "offeror's ability to provide uninterrupted high-quality work." (Solicitation ¶ L.18).

■■■■ In general, "contracting officers are vested with wide discretion with regard to the evaluation of bids." *Labat–Anderson, Inc. v. United States,* 42 Fed.Cl. 806, 846 (1999). "Decisions on cost realism are within the agency's sound discretion and expertise, and the judgment will not be overturned absent any rational basis." Steven W. Feldman, *Government Contract Awards* § 11:16 n. 8 (1998) (citing *Halifax Technical Serv., Inc. v. United States,* 848 F.Supp. 240 (D.D.C.1994)). "Reflecting this broad discretion, plaintiff has an unusually heavy burden of proof in showing that the [acceptability] determination ... was arbitrary and capricious." *Id.* (internal quotation marks and citations omitted). "Plaintiff's burden is to demonstrate that the agency's determination lacked a reasonable basis." *Labat–Anderson,* 42 Fed.Cl. at 846.

■■■■ In this case, the court finds that the government did review CTA's proposed prices for Skill Level 16 work and had a reasonable basis for its conclusion that plaintiff's prices for Skill Level 16 were not so low

that the contractor's ability to provide the services required would be jeopardized. The "Price Analysis" section from the Source Selection Information shows that the government actually reviewed CTA's prices "to ensure the contractor employees under this requirement [employee compensation] would be compensated fairly, under clause *L.18 Evaluation of Compensation for Professional Employees.*" (Bold and italics in original). This document concluded that "[a]n analysis of their pricing demonstrates CTA's compliance with this requirement" after the government

> compared proposed prices received in response to the solicitation; compared prior GSA FISSP contract prices (country-wide) for the same or similar skill levels to CTA's proposed pricing; and compared their price against the independent government estimate. Additionally, we evaluated the relationship of the skill levels involved and determined that they reasonably reflect an understanding of the work and skills required and the labor markets involved.

The government paid particular attention to CTA's proposed price for Skill Level 16, noting that under "our current contract we are paying $73.57 for that requirement," but CTA had "proposed a rate of $32.71, a 55% reduction from the current contract." But the government justified the disparity by observing that incumbent "CDSI has proposed $34.60 for this site a 53% reduction from what they are currently billing," and "[e]ven CSC, the highest priced offeror ha[d] proposed $37.06 for this category." It then concluded that the labor market had apparently responded to a shortage of workers

---

of low compensation rates would constitute evidence of a bidder's inability to meet the contract requirements. In the original version of paragraph L.18, the Solicitation incorporated FAR § 52.222–46 verbatim, stating that the government "will" evaluate a bidder's compensation plan, but compensation levels lower than those offered under the predecessor contract "may" indicate lack of sound management judgment and lack of understanding of contract requirements. Paragraph L.18.c also stated that "since it may impair the contractor's ability to attract and retain competent professional service employees," unrealistically low compensation "may be viewed as evidence of failure to comprehend

the complexity of the contract requirements." *See also* 48 C.F.R. § 52.222–46(d) ("Failure to comply with these provisions may constitute sufficient cause to justify rejection of a proposal"). Section M of the Solicitation also stated that, although the government "will" evaluate proposals for cost realism, unrealistically low cost or price proposals "may be deemed reflective of an inherent lack of technical competence ... and may be grounds for the rejection of the proposal." The Solicitation consistently used the word "may" when it described what the government would or could do with the compensation evaluation.

qualified for Skill Level 16 with a "larger labor pool" resulting in "a dramatic reduction in pricing" which made CTA's proposed rates realistic.

The government also acknowledged that the "Government estimate is higher than the price proposal received by CTA, and even higher than our highest priced offeror CSC." But the government found that the source for its own estimate, the Mercer survey, "did not represent the same environment that the contract represents" for three reasons: the contract was for large jobs with "fairly steady level of effort throughout the period of the contract," "contractor's cost[s] cease when the work on a task stops since the employees are no longer paid by the company," and "the method of operation of the contract by design sharply limits the overhead costs that the company ... will incur." These were not speculative justifications contrived by the government on its own. The "rationale was expressed by [Mercer's] national survey project manager, Mary Lowe," and Mercer's "Joyce Cain, Principle and manager of the national surveys." Cain even added that the difference between bidders' rates and Mercer's rates (on which the government estimate relied) was "also due to the fact that the survey represents the compensation to dedicated ADP professionals hired full time by a company for internal services," a purpose which the government found "very different" from the Solicitation.

Plaintiff takes issue with only the first of the government's justifications, arguing that the contract itself stated that "the amount of work cannot be accurately predicted and there is no assurance of a steady stream of work." (Solicitation ¶ C.3.1). Even assuming that the court found that the government was wrong to rely on the first justification, plaintiff has not produced evidence to dispute the validity of the others. Therefore, the government's conclusion that the Mercer survey reflected labor rates for a different environment has a reasonable basis. Furthermore, since the government estimate was based on what were reasonably considered at the time inflated Mercer rates, the government also had a rational basis for finding that CTA's pricing was reasonable, even though it was lower than the government

estimate. Consequently, the court finds that the government acted within its discretion when it decided not to reject CTA's certification of compliance with paragraph L.18 or plaintiff's bid, because it reasonably addressed the evidence that put the government on notice that CTA's rates might be unreasonably low.

## B. Doctrine of Mistake

■ As an add-on to support Count IV, plaintiff's cross-motion cites *American Ship Building Co. v. United States*, 228 Ct.Cl. 220, 654 F.2d 75 (1981), arguing that there was such disparity between the government's estimate and CTA's bid that the government had a "separate duty to warn CTA that its certification was subject to rejection." Plaintiff is wrong because the government's duty to warn arises only when the government either knew or should have known that a bid contains a mathematical or typographical error or is based on a misreading of the contract's specifications. *R.J. Sanders, Inc. v. United States*, 24 Cl.Ct. 288, 292, 1991 WL 197877 (1991). Plaintiff has not proved these elements.

Plaintiff argues that the government had a duty to warn it "that its certification was subject to rejection." If this contention is interpreted literally, then plaintiff's argument is without merit because the amended Solicitation unequivocally states that bids failing to comply with the requirements of paragraph L.18 "may constitute sufficient cause to justify rejection of a proposal." (Amendment 18). Therefore, the government clearly warned plaintiff that its certification was "subject to rejection."

If plaintiff's citation is read more broadly to invoke the doctrine of mistake, then, in order to make sense of the argument, the court would have to assume that plaintiff argues that the government had a duty to warn plaintiff that there may have been a mistake made in the preparation of the bid. This argument is also wrong.

Plaintiff does not argue that there was a typographical or mathematical error in the bid, so the first prong of the mistake doctrine does not apply here. The second prong, that the bid was based on a misreading of con-

tract specifications, also fails because plaintiff's error was a business judgment, for which the government cannot be held liable. *See R.J. Sanders*, 24 Cl.Ct. at 292 ("A contractor cannot recover for a mistake in judgment"); *American Ship Bldg.*, 654 F.2d at 80 ("For relief, there must be clear and convincing evidence of a genuine unilateral mistake of fact—not an error in judgment"); *Cibinic* at 654 (doctrine of mistake does not provide relief for errors in business judgment). In preparing its bid, plaintiff exercised its business judgment when it estimated the relative amounts of work to be done using the various I–CASE tools. *See* P 1502, 1506.1 (plaintiff's prepared statement that CTA expected 70–80% of work to involve "classical I–CASE tools" and only 5–10% to require IEF). As an experienced business, plaintiff either knew or should have known that there was inherent risk to preparing a bid for a skill level which encompassed several different I–CASE tools [7] if, as plaintiff alleges, the cost of working with those different I–CASE tools varied.[8] Therefore, CTA took a conscious gamble with patent risks. *See* John Cibinic, Jr., & Ralph C. Nash, Jr., *Formation of Government Contracts* 654 (1998 3d ed.). If CTA had wanted to minimize those patent risks by learning all it could about the proportionate makeup of Skill Level 16 work, it had the duty to inquire. *See Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed.Cir. 1996) (bidder "had a duty to seek clarification from the government [when ambiguity was patent] and its failure to do so precludes acceptance of its interpretation" of the request for proposals). In any event, plaintiff was on notice that the fully burdened rates for all skill levels were public information. *See infra* (discussing Amendment 21). Therefore, plaintiff's decision to submit a bid without seeking to clarify was a business judgment for which CTA is responsible. Since the government cannot be liable for that business decision, CTA cannot recover under the doctrine of mistake. *See R.J.*

*Sanders*, 24 Cl.Ct. at 292; *American Ship Bldg.*, 654 F.2d at 80.

■ CTA is also barred from recovery under the doctrine of mistake because a plaintiff "may recover only if defendant's responsible officials knew or should have known of the mistake at the time the bid was accepted." *Chernick v. United States*, 178 Ct.Cl. 498, 372 F.2d 492, 496 (1967). In this case, plaintiff has not shown that the government knew or should have known that CTA mistakenly bid too low for Skill Level 16 work.

■ "The test of what an official in charge of accepting bids 'should' have known must be that of reasonableness, *i.e.*, whether under the facts and circumstances of the case there were any factors which reasonably should have raised the presumption of error in the mind of the contracting officer." *Id.* Factors which may impute knowledge of error include:

(1) facially apparent errors, such as multiplication errors made when computing unit prices into total price; (2) disparity in prices among the bids; (3) disparity between the bid and the private government estimate; (4) disparity between the bid and the cost of prior procurements of the same item; (5) disparity between the bid price and, if the contracting officer knows it, the market value for the goods.

*Cibinic* at 659 (quoting *BCM Corp. v. United States*, 2 Cl.Ct. 602, 610 (1983)).

In this case, there was disparity between plaintiff's bid and the government estimate, and disparity between the bid price and the cost of prior procurements of the same item. Moreover, the government had actual knowledge of the disparities. However, the circumstances as a whole as they were known at the time demonstrate that the government was not on notice that a mistake had been made. *See Cibinic* at 659 (factors not applied mechanically, and no single rule necessarily imputes knowledge of error; government

---

**7.** Although it is highly unlikely that defendant would agree that all of plaintiff's extensive list of over 40 software tools would satisfy the contract's definition of I–CASE tool, the contracting officer has demonstrated agreement that at least

three tools (IEF, IEW, and ORACLE CASE) would have qualified.

**8.** This assumes, of course, that IEF workers were more expensive than non-IEF I–CASE workers.

charged with knowledge only after full consideration of all circumstances).

CTA's bid for Skill Level 16 work was $32.13.[9] The government estimate was $41.87,[10] making CTA's bid 23% below the government's estimate, and 56% lower than the price of equivalent work under the CDSI contract. Moreover, as evidenced by the Source Selection Information, the government was on notice that CTA's bid was lower than the cost of the same line item under the predecessor contract and notably lower than the government's estimate. However, those disparities do not mean that the contracting officer was on notice that CTA had submitted a mistaken bid. The uncontroverted evidence demonstrates that all four of the bidders submitted bids that were below the government's estimate. Furthermore, all of the bidders, including the incumbent CDSI, were well below the cost for equivalent work under the prior contract. CDSI's average bid[11] for Skill Level 16 work was $36.26 per hour, 51% below the price it had been earning under the prior contract, and more than 13% below the government's estimate. Moreover, CTA may not have always been the lowest bidder for Skill Level 16 work— AMI appears to have underbid CTA for Skill Level 16 work in at least three of the five geographical work areas.[12]

 The relative uniformity of low bids for the same work explained away the "red flag" that CTA's bid was below the government's estimate. Incumbent CDSI's dramatic drop in price removed a reason to believe that all of the bidders were mistaken about the type of work to be performed under the new contract, for CDSI knew what kind of I–CASE work had been required under the prior contract and the price of that work. Furthermore, these facts made it unlikely

that CTA made a "clear cut clerical or arithmetical error" which should have been identified by the contracting officer. Consequently, the court finds as a matter of law that the circumstances in this case did not give the government constructive notice that CTA had submitted a mistakenly low price which should be brought to the bidder's attention for correction. See R.J. Sanders, 24 Cl.Ct. at 293 (as a matter of law, government did not have constructive notice of bidder's mistake where bid was 32% below government's estimate, when majority of bids were also lower than the government's estimate).

### C. Constructive Change

Count V alleges that the government constructively changed the contract requirements because GSA ordered exclusively IEF work for Skill Level 16, after the contract allegedly "required CTA to provide I–CASE Engineers for a number of different software environments." This claim is without merit because plaintiff failed to prove that the work was not included within the scope of the contract.

 "A constructive change occurs where a contractor performs work beyond the contract requirements, without a formal order under the changes clause, either by an informal order of the Government or by fault of the Government." Miller Elevator Co. v. United States, 30 Fed.Cl. 662, 678 (1994). To present a prima facie case for constructive change, plaintiff must demonstrate "two base components, the change component and the order or fault component." Id. "The 'change' component describes work outside of the scope of the contract, while the 'order/fault' component describes the reason that the contractor performed the work."

---

9. This was the average of the on-site bids for the five contract areas during year one of the contract.

10. The average of the on-site estimates for four of the five contract areas during year one of the contract. It is unclear why the government estimate for area 3 was not included in the appendix.

11. The average of on-site bids for four of the five contract areas during year one of the contract.

Again, it is unclear why bids for area 3 do not appear in the record.

12. For on-site Skill Level 16 work during year one, AMI bid $32.04, $32.02, and $32.02 respectively for areas 1, 2, and 4. CTA submitted corresponding bids of $33.78, $32.74, and $32.71, making CTA's bids higher than AMI's bids by differences of $.74, $.72, and $.69 per hour, respectively. However, it is unclear whether these are burdened rates or direct labor prices only.

*Id.; SIPCO Servs. & Marine, Inc. v. United States,* 41 Fed.Cl. 196, 223 (1998). "To identify a constructive change, this court consults the contract language." *Aydin Corp. v. Widnall,* 61 F.3d 1571, 1577 (Fed.Cir.1995). Contract interpretation is an issue of law. *Aydin,* 61 F.3d at 1577; *Rutgers,* 41 Fed.Cl. at 769.

In this case, the order component may have been satisfied because the government issued task orders requesting only IEF work under Skill Level 16. However, plaintiff cannot demonstrate that IEF work was outside the scope of the contract, nor that ordering only IEF work under Skill Level 16 was different from the work contemplated by the contract. Paragraph C.4.1 of the contract (Amendment 18) describes the software environments in which the successful bidder would have to be prepared to operate. It states: "Software. Executive programming languages, 4th generation languages, database management systems, operating systems and other standard software that may be used in task performance includes, but is not limited to ... IEF, IEW, ORACLE CASE ...."[13] Thus, the use of IEF and other I–CASE tools was expressly included within the scope of the contract. Furthermore, the option not to order work for any of the listed software programs was also patently expressed. The contract used the term "may be used" before presenting the list of software tools. Thus, the contract states that CTA was to be prepared to support work in a variety of software environments, but it does not guarantee that the government would order Skill Level 16 work using more than one I–CASE tool. This point is strengthened by the fact that the contract warned that GSA would order work as it was requested by GSA's clients, so GSA could not know the precise types or amounts of services which would be ordered during the contract term. (Amendment ¶ C.1.4). Therefore, the court finds that it was within the scope of the contract for GSA to order Skill Level 16 work using one but not all of the I–CASE tools listed. There was no con-

structive change, so Count V is without merit.

**D. Misrepresentation in the Inducement**

**1. Jurisdiction**

Plaintiff's first count alleges that the government fraudulently induced CTA to enter into the contract. Count III alleges that the government breached the contract by making material misrepresentations to plaintiff before the contract was entered. Both counts are based on the same factual allegations—that the government misrepresented that Skill Level 16 would not require IEF expertise exclusively, and that the government misrepresented that CTA's proposed compensation rates for Skill Level 16 were realistic.

This court has held that "to the extent that plaintiffs' claim implies that the government acted negligently or so as to fraudulently induce plaintiffs to enter into a [contract], ... such claims would allege tortious behavior by government officials [and j]urisdiction to resolve claims sounding in tort does not lie in this court." *Dureiko v. United States,* 42 Fed.Cl. 568, 581 (1998) (footnote omitted). The court has also held that "it is well settled that the United States Court of Federal Claims lacks ... jurisdiction to entertain tort claims," *Dureiko,* 42 Fed.Cl. at 581 (quoting *Shearin v. United States,* 992 F.2d 1195, 1197 (Fed.Cir.1993), citing and explaining the Tucker Act, 28 U.S.C. § 1491(a)(1)).. It is also clear that "[j]urisdiction to hear tort claims is exclusively granted to the United States District Courts under the Federal Tort Claims Act. 28 U.S.C. 1346(b) (1994)." *Dureiko,* 42 Fed.Cl. at 581–82. "Therefore, this court has no jurisdiction over the allegations asserted by plaintiffs, which may be characterized as based [exclusively] upon tortious conduct, including plaintiffs' claim of fraudulent inducement to contract." *Id.* at 582.

However, in this case, the fraudulent inducement claim and the breach of contract by misrepresentation claim "arise[ ] from the

---

**13.** Again, plaintiff and the contracting officer have demonstrated agreement that IEF, IEW, and ORACLE CASE were I–CASE tools.

allegation that defendant made a pre-contractual representation [in the amended Solicitation] which plaintiff[ ] believed was incorporated into the contract." *Badgley v. United States,* 31 Fed.Cl. 508, 514 (1994). The court finds that the claims in Counts I and III are "entirely dependent on, and in fact evolve[ ] from the contract. Plaintiff's claim[s are] in substance … claim[s] for breach of contract by misrepresentation and when the substance of the claim is in contract, subject matter jurisdiction exists under the Tucker Act even if tortious elements also exist." *Id.; see also Edwards v. United States,* 19 Cl.Ct. 663, 669 (1990) ("where privity of contract exists between the parties, there is a contract aspect to a claim for misrepresentation at the pre-award stage, and subject matter jurisdiction exists"); *Gregory Lumber Co. v. United States,* 9 Cl. Ct. 503 at 518, 520, 525–26 (1986) (tortious breach of contract styled as misrepresentation in the inducement is breach of contract reviewable under Tucker Act). Therefore, the court has jurisdiction to consider the counts.

## 2. Breach of Contract: Fraud in the Inducement

When addressing the merits of a claim for misrepresentation in the inducement, this court has held:

> In order for plaintiffs to survive defendant's motion for summary judgment, they must allege facts sufficient to support a finding on all four of the following elements: (1) that there was a misrepresentation; (2) that the misrepresentation was either fraudulent or material; (3) that it operated as an inducement to entering into the contract; and (4) that plaintiffs were justified in relying on the misrepresentation. Restatement (Second) of Contracts § 164 (1981).

*Badgley,* 31 Fed.Cl. at 514.

■ To constitute a misrepresentation, the statement complained of must have been stated "so positively and affirmatively that reliance may be legally placed thereon." 2 John Cosgrove McBride & Thomas J. Touhey, *Government Contracts: Cyclopedic Guide to Law, Administration, Procedure* § 13.40 at p. 13–27 (1999). In an effort to establish the first element, plaintiff alleges that, by accepting CTA's self-certification that CTA's proposed compensation rates were not unrealistically low, GSA misrepresented that CTA's rates were realistic. Plaintiff's argument fails to satisfactorily allege a misrepresentation as a matter of law because, according to the terms of the amended Solicitation, acceptance of the certification was not a representation that plaintiff's compensation plan was realistic. *See Rutgers,* 41 Fed.Cl. at 769 (contract interpretation is issue of law).

Amendment 21 stated that "[u]nless the contracting Officer [sic] has reason to believe otherwise, he will accept that certification" of compliance with paragraph L.18. The amendment then stated that bidders "are required to have a plan that complies with [paragraph L.18], but you are not required to submit the plan with your offer." Plaintiff would have the court believe that by accepting CTA's certification, the government certified that plaintiff could rely on the contracting officer to review a compensation plan which CTA knew the contracting officer never received, and that the government guaranteed that plaintiff's fully burdened rates would be adequate to guarantee a steady stream of Skill Level 16 qualified workers. The language of the amended Solicitation does not support that interpretation for at least two reasons. First, by the time Amendment 18 was issued, paragraph L.18 no longer stated that the contracting officer would evaluate the compensation plan. Second, the court finds that paragraph L.18 places the onus of designing and guaranteeing a reasonable compensation plan capable of producing reliable service without cost overruns squarely on the bidder.

■ Plaintiff also argues that by listing more than 70 software environments in paragraph C.4, the government misrepresented to plaintiff that Skill Level 16 would not use a single software environment almost exclusively. The uncontroverted evidence shows that plaintiff is correct to the extent that it suggests that paragraph C.4 lists more than one I–CASE program, including IEF, IEW, and ORACLE CASE. However, paragraph

C.4 does not, in the context of the overall contract, represent that GSA would order a subjectively appropriate blend of IEF and non-IEF work under Skill Level 16. In fact, as was discussed *supra*, the amended Solicitation represented that plaintiff could not expect a positive or affirmative representation of the type or quantity of work to be done under the contract. (Amendment 18 ¶ C.1.4) The amended Solicitation also reserved the flexibility to order only personnel with the expertise GSA and its clients required. (Amendment 18 ¶ C.9 ("GSA reserves the right to require specific expertise in order to meet the requirements of certain tasks")). Accordingly, the court finds as a matter of law that the "misrepresentations" alleged by plaintiff were not misrepresentations, and Count I will be dismissed.

### 3. Breach of Contract: Misrepresentation

In Count III, plaintiff alleges the same two "misrepresentations" alleged in Count I, but argues that the count is different because it is based on a different legal theory—a theory plaintiff calls "breach of contract for misrepresentation." Plaintiff admits that the elements of both breach of contract for misrepresentation and breach of contract for misrepresentation in the inducement are "very similar," but argues in its cross-motion that they are distinct causes of action because of one exception: "Whereas misrepresentation in the inducement requires actual knowledge or recklessness by the defendant, a negligent failure to ascertain the truth, followed by a misrepresentation of a material fact, will suffice to constitute a misrepresentation actionable as a breach of contract."

The court disagrees with plaintiff's argument that the "two" theories propounded are distinct. Plaintiff has apparently assumed that, because there are two alternative ways to satisfy the second element of misrepresentation in the inducement ("that the misrepre-

sentation was either fraudulent or material"), there must be two different legal theories. That assumption is wrong and the arguments advanced in favor of Count III fail for the same reasons the court dismissed Count I—plaintiff did not show, as required by the first element, that there was a misrepresentation.

 The court notes that even if the court reads the Complaint more broadly and analyzes Count III under the more general theory of misrepresentation, rather than the duplicate theory presented in plaintiff's brief, then Count III must still be dismissed. "Misrepresentation occurs when the government misleads a contractor by a negligently untrue representation of fact, or fails to disclose information it has a duty to disclose." *Meyers Companies, Inc. v. United States,* 41 Fed.Cl. 303, 311 (1998) (quoting *John Massman Contracting Co. v. United States,* 23 Cl.Ct. 24, 31 (1991)). Because an alleged "failure to disclose information the government has a duty to disclose" is really an allegation of superior knowledge [14] (which plaintiff alleged in Count II), and because the court finds that the plaintiff has not presented an adequate claim for superior knowledge, *see infra,* plaintiff has not satisfied the first prong of a claim for misrepresentation.

Plaintiff fails the second prong as well, because it has failed to demonstrate that the government misled CTA by a negligently untrue representation of fact. As the court has already explained, the amended Solicitation did not represent that Skill Level 16 work would be comprised of a blend of IEF and non-IEF work in any particular proportion, nor did the amended Solicitation state that acceptance of CTA's certification of compliance with paragraph L.18 was a representation to plaintiff that its compensation plan was adequate to guarantee a steady stream of qualified Skill Level 16 workers. Furthermore, the court finds that the government was not negligent. The government performed a price realism analysis; identified

---

14. *Reliance Ins. Co. v. United States,* 27 Fed.Cl. 815, 828 (1993) (misrepresentation occurs when the government fails to disclose superior knowledge); *see also John Massman,* 23 Cl.Ct. at 31 (defining "misrepresentation" as quoted *supra,* then listing elements of superior knowledge as

elements of the "failure to disclose" prong of "misrepresentation"); *see also* McBride & Touhey, §§ 13.40, 13.100[5] (identifying the theory of superior knowledge as a type of misrepresentation).

suspected problems with CTA's proposed price for Skill Level 16 work; performed additional research by asking independent market sources to explain discrepancies between bid prices, the government estimate, and the price paid to the incumbent contractor for I–CASE work; and arrived at the reasonably based conclusion that the bid was realistic. *See supra.* Therefore, the court finds that plaintiff's misrepresentation claim is without merit and Count III will be dismissed.

### E. Superior Knowledge

■ "A contractor, under the superior knowledge doctrine, can recover for breach of contract based upon the government's failure, as a party to the contract, to disclose vital information concerning the performance of the contract." *Hardwick Bros. Co., II v. United States,* 36 Fed.Cl. 347, 386 (1996) (*citing Petrochem Serv., Inc. v. United States,* 837 F.2d 1076, 1078–79 (Fed.Cir. 1988)). Plaintiff asserts in Count II that the government breached the contract by failing to disclose superior knowledge of four alleged facts: (i) that under the predecessor contract, all I–CASE engineers had been required to have IEF expertise; (ii) that the new contract would require or would probably require IEF expertise almost exclusively; (iii) of compensation rates under the predecessor contract; and (iv) that the compensation rates were unrealistically low.

■ In order for each alleged failure to disclose superior knowledge to survive defendant's motion for summary judgment, plaintiff

> must produce specific evidence that it (1) undert[ook] to perform [the contract] without vital knowledge of a fact that affects performance costs or direction, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

---

**15.** Plaintiff does not allege that knowledge of prior contract requirements affected the duration

*GAF Corp. v. United States,* 932 F.2d 947, 949 (Fed.Cir.1991) (internal quotations and citations omitted); *see also Laidlaw Envtl. Svcs. (GS), Inc. v. United States,* 43 Fed.Cl. 44, 50 (1999); *American Ship Bldg. Co. v. United States,* 228 Ct.Cl. 220, 654 F.2d 75, 79 (1981). The court will consider each of plaintiff's allegations in turn.

**1. Knowledge That All I–CASE Positions Under the Predecessor Contract Had Required IEF Expertise.**

Plaintiff argues that the government should have told CTA that all I–CASE engineers used during the predecessor contract had been required to have IEF expertise. This allegation of superior knowledge fails because plaintiff does not show that the government's knowledge was vital to performance of the contract.

■ "An implicit element in the [superior knowledge claim] is that the government actually possessed vital information." *Hardwick Bros.,* 36 Fed.Cl. at 386; *see also Servidone Constr. Corp. v. United States,* 19 Cl.Ct. 346, 375 (1990), *aff'd* 931 F.2d 860 (Fed.Cir. 1991). "To satisfy the requirements of the doctrine [of superior knowledge], the vital knowledge, which the Government possesses and the contractor does not, must be a fact that affects performance costs or duration of performance." *William T. Thompson, Co. v. United States,* 26 Cl.Ct. 17, 24 (1992) (emphasis omitted), *aff'd sub nom. Hercules, Inc. v. United States,* 24 F.3d 188 (Fed.Cir.1994), *aff'd* 516 U.S. 417, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996).

■ In this case, plaintiff has demonstrated that the government knew that all I–CASE work under the CDSI contract required IEF expertise, and that CTA undertook to perform the contract without knowledge of that fact. However, plaintiff does not show that it was vital to know that fact because plaintiff does not show that the knowledge affected performance costs.[15] In order to demonstrate that the government had knowledge that affected the cost of performing the contract, plaintiff must show that the government also knew that the require-

---

of performance, so the court need not address that prong.

ments of all GSA clients under the predecessor contract could reliably predict the requirements of all GSA clients under the CTA contract. Without evidence that the government possessed such knowledge, there would be no nexus between cost of performance and knowledge of the alleged fact complained of and, therefore, knowledge of predecessor contract orders for IEF work would not be vital.

The evidence of record does not show that the government knew that all or almost all Skill Level 16 work would require IEF expertise. Plaintiff argues that the government must have known that GSA would order only IEF because IEF was the only tool ordered under the CDSI contract, all of that IEF work was used for the SAAS–MOD project in Virginia (in geographic area 4), and the government knew that SAAS–MOD project orders would continue during the CTA contract. However, at best, the record shows only that the government knew that some I–CASE work would require IEF.

The evidence shows that the government estimated that approximately 40% of all I–CASE work would be ordered outside of geographic area 4, *see supra* at n. 2, and there is no evidence to suggest that the government anticipated that IEF would be the I–CASE tool of choice for Skill Level 16 work not ordered for the SAAS–MOD project. In fact, the Solicitation shows that the government did not know what type of work would be ordered or whether it would be ordered at all. (Solicitation ¶ C.1.6 ("It is impossible to determine the precise types or amounts of services and products that will be ordered during the contract term")); (Solicitation ¶ C.3.1 ("The time of issuance and amount of work in Task Orders cannot be accurately predicted")); (Amendment 18 ¶ B.2 ("The estimated annual hours shown in Section B are estimates only. The Government cannot predict the precise quantity of services to be ordered under this contract")). This means that, even assuming that at the time the Solicitation was issued and amended the government knew that every hour of I–CASE work ordered in geographic area 4 would be performed for the SAAS–MOD project, and assuming that the government

knew that the SAAS–MOD project would not order I–CASE work using any non-IEF I–CASE tool, the evidence cannot show that the government knew that almost all I–CASE work would require IEF expertise. Thus, the evidence does not show that the government had knowledge that affected the cost of performing the CTA contract.

### 2. Knowledge That the Government Knew That All I–CASE Engineers Would Be Required to Have IEF Expertise

Plaintiff's second allegation of failure to disclose vital superior knowledge also fails because plaintiff does not show that at the time the Solicitation was issued and amended the government knew that all or practically all I–CASE engineers would be required to have IEF expertise to perform tasks ordered under CTA's contract. *See* discussion *supra.* Therefore, without evidence that defendant actually knew the fact allegedly withheld from plaintiff, the allegation does not present a valid claim for failure to disclose superior knowledge. *See Hardwick Bros.,* 36 Fed.Cl. at 386; *see also Servidone,* 19 Cl.Ct. at 375.

### 3. Knowledge of I–CASE Compensation Rates Under the Predecessor Contract

Plaintiff complains that the government should have informed CTA that it was paying CDSI more than $70.00 per hour for I–CASE work under the predecessor contract. This claim does not withstand summary judgment because the uncontroverted evidence shows that the government put plaintiff on notice to inquire about the information, and the amended Solicitation was not misleading. Therefore, the claim fails to satisfy the third element of the superior knowledge doctrine.

In response to CTA's November 17, 1993 question about whether GSA would provide direct annual salaries and fringe benefits of incumbent contract employees, the government replied that the "fully burdened rates on the prior contract are public information." Amendment 21. The court finds that this put plaintiff on notice that fully burdened rates for I–CASE engineers were available,

and invited plaintiff to obtain the most recent rates.

Plaintiff suggests that the government's response was misleading because plaintiff interpreted Amendment 21 to mean that plaintiff should submit a FOIA request if it had not submitted a request previously, and defendant knew that plaintiff had submitted a FOIA request before the CDSI contract was modified to include I–CASE work.[16]

The interpretation of Amendment 21, a contract provision, is a question of law. *See Rutgers*, 41 Fed.Cl. at 769. The court finds that plaintiff is wrong to suggest that in Amendment 21 GSA invited bidders to request fully burdened rates only if they had never submitted a FOIA request previously. The amendment itself contained no contingency or even hint that bidders that had obtained the rates previously need not submit a request for updated information.

■■■ Furthermore, the court finds it unreasonable for plaintiff to suggest that the government should have known that it had already submitted a FOIA request which put the government under an obligation to either update the FOIA response or notify plaintiff that the prior response was outdated. The duty to obtain reasonably up to date information about relevant prior contracts rests upon the bidder, not the government. This is demonstrated in *Dale Ingram, Inc. v. United States*, 201 Ct.Cl. 56, 475 F.2d 1177 (1973), where the Court of Claims found that a building contractor had been "clearly negligent" in failing to learn that a land fill contract to bring the construction site to grade before the builder began construction had changed. The original land fill contract required compaction to 90% density, but it was later changed to require only "dense and uniform" fill. Plaintiff did not learn about the change, and submitted its bid with the assumption that the 90% compaction require-

ment was still in effect. The court found that

> the change in the land fill contract was made before the invitation for bids was issued for the construction contract and at least eight months before plaintiff was awarded the construction contract. Its failure to check the contents of the land fill contract during this long lapse of time before it submitted its bid was plain negligence.

*Id.* at 1184.

■■■ In this case, CTA also knew the contents of the preceding contract before the invitation for bids was issued, but submitted its bid without investigating whether any changes to the CDSI contract had occurred despite the undisputed facts that (a) Amendment 21 specifically told plaintiff that fully burdened rates under the prior contract were available, (b) more than twenty months had passed since CTA had last obtained the labor rates for the CDSI contract, (c) CTA had submitted its FOIA request and received the information before the Solicitation was even issued, and (d) plaintiff knew that the Solicitation had been amended to include a skill level which did not exist at the time CTA had submitted its FOIA request. Thus, CTA's failure to obtain updated information about the CDSI contract was its own fault.

The court also finds support for its conclusion in *Hardwick Brothers*, where the court concluded that a contractor was put on adequate notice to inquire about useful information contained in the Army Corps of Engineers' field books because, even though the contractor did not inspect them, the contractor had received notice that the books were available for inspection. *Hardwick Bros.*, 36 Fed.Cl. at 387–88. The court found that "notice as to the availability of the Corps's field books was adequate, that the information in the field books may be imputed to plaintiff and, accordingly, that the alleged

---

**16.** Plaintiff argues that it was misled by Amendment 14 which reduced the number of skill levels from 29 to 17 without reducing the overall scope of the contract. Plaintiff argues that this change expanded the scope of Skill Level 16 to absorb work previously included in different skill levels, making Skill Level 16 a "general I–CASE skill level that would likely employ a variety of different software skills." This argument is wrong because it is based upon the erroneous assumption that the scope of the 12 skill levels removed by Amendment 14 must have been distributed throughout all of the remaining skill levels. In actuality, however, the scope of Skill Level 16 work as defined in the amended Solicitation did not expand, so the reduced number of skill levels does not advance plaintiff's claim.

unavailability of the field books does not support plaintiff's withholding of superior knowledge claim." *Id.* at 388. In this case, the court finds that CTA cannot complain that it was misled when the government gave CTA notice that fully burdened rates were available and CTA declined to inspect the information when invited to do so.[17] "The law is clear that the government is not required to act as a fiduciary toward its contractors [and] ... plaintiff cannot shift to defendant the blame for its own inaction and failure to fully investigate prior to bidding." *Hardwick Bros.*, 36 Fed.Cl. at 394.

**4. Knowledge That CTA's Compensation Rates for I–CASE Engineers Were Unrealistically Low**

Plaintiff also argues that defendant failed to disclose superior knowledge that plaintiff's proposed compensation rates for I–CASE engineers were unrealistically low. However, it has already been shown, *supra*, that plaintiff has failed to establish government knowledge of the alleged fact. Since failure to disclose superior knowledge can only be established where the government actually possessed the vital knowledge complained of, *see Hardwick Bros.*, 36 Fed.Cl. at 386; *Servidone Constr.*, 19 Cl.Ct. at 375, this claim is also without merit.

### CONCLUSION

Because plaintiff has failed to establish the requisite elements for any of its claims, the court holds that all five counts in plaintiff's Complaint are without merit. Accordingly, plaintiff's cross-motion for summary judgment is *DENIED*, defendant's motion for summary judgment is *ALLOWED*, and the complaint in the above-captioned case shall be dismissed with prejudice.

**IT IS SO ORDERED.**

---

17. The court also finds that plaintiff received timely notice. In *Hardwick Brothers*, the court found that notice was adequate even though it was received only two working days prior to the date bids were due and no bidder sought an opportunity to review the books. 36 Fed.Cl. at 387. Amendment 21, by contrast, was issued on December 14, 1993, and fellow bidder CSC actually did request the information, which the government provided on December 20, 1993. The fact that CTA submitted its BAFO on December 17, 1993, three days before CSC received the fully burdened CDSI contract rates, does not show that the information was unavailable to CTA because CTA could have submitted a timely BAFO as late as December 30, 1993.